LANE v. THE MISSOURI PACIFIC RAILWAY COMPANY, *Appellant.*

In Banc, December 23, 1895.

1. **Practice in Supreme Court**: DEFECTIVE ABSTRACT OF RECORD : ADDITIONAL ABSTRACT. Where an abstract of the record fails to show the seasonable filing of the bill of exceptions and saving of exceptions to instructions given, the omission may be supplied by an additional abstract.

2. **Railroad**: NEGLIGENCE : DUTY TO RING BELL OR SOUND WHISTLE AT CROSSING : INSTRUCTION. An instruction in an action against a railroad company for the wrongful death of a person at a public crossing, which declares that it was the duty of defendant's servants, when approaching the crossing, "either to ring the bell * * * or to sound the whistle," and if they neither rang the bell nor sounded the whistle

an d the deceased was struck and killed on account of failure to either ring the bell or sound the whistle, the verdict should be for the plaintiff, unless deceased was guilty of negligence contributing to his death, is not open to the objection that it required defendant's servants to both ring the bell and sound the whistle when approaching the crossing.

3. ———: ———: CONTRIBUTORY NEGLIGENCE: BURDEN OF PROOF: INSTRUCTION. An instruction in an action against a railroad company for the wrongful death of plaintiff's husband which places the burden on defendant of proving contributory negligence on the part of deceased by a preponderance of the evidence, correctly declares the law and is not objectionable because of its failure to call attention to evidence introduced by plaintiff tending to show contributory negligence, it being the duty of defendant to ask an instruction covering the plaintiff's evidence, if it desired it.

4. ———: ———: EVIDENCE: DRUNKENNESS. Evidence that one killed by a train at a railroad crossing was given to the habit of intoxication is not admissible to prove contributory negligence on his part in an action for damages against the company for his death. (SHERWOOD, J., dissenting.)

5. ———: ———: CROSSING: TRAVELER: DUTY TO LOOK AND LISTEN. One killed by a train at a railroad crossing, who could have heard the train, if he had listened, and could have seen it, if he had looked, there being nothing to obstruct his view for some distance from the crossing, will be held to have been guilty of contributory negligence in an action for damages for his death.

6. ———: ———: ———: ———. The fact that the team of the deceased was running away at the time he was struck and killed on a railroad crossing by a locomotive will not render the company liable for his death, in the absence of evidence to show that the team was frightened by any act or omission of the company's servants.

*Appeal from Jackson Circuit Court.*—HON. E. L. SCARRITT, Judge.

REVERSED.

*Elijah Robinson* for appellant.

(1) The demurrer to the evidence should have been sustained. It was the duty of plaintiff's husband, when approaching the railroad crossing, to use every reasonable precaution to avoid the accident. He was bound to look and listen for an approaching train. If

there were difficulties in the way of either seeing or
hearing, he was on account thereof required to exercise
the greater care.    Beach on Con. Neg. [2 Ed.], sec. 180;
*Fletcher v. Railroad*, 64 Mo. 484; *Harlan v. Railroad*,
64 Mo. 480; *Henze v. Railroad*, 71 Mo. 636; *Zimmer-
man v. Railroad*, 71 Mo. 476; *Purl v. Railroad*, 72 Mo.
168; *Turner v. Railroad*, 74 Mo. 602; *Kelley v. Rail-
road*, 75 Mo. 138; *Lenix v. Railroad*, 76 Mo. 86; *Hixson
v. Railroad*, 80 Mo. 340; *Stepp v. Railroad*, 85 Mo. 229;
*Kelley v. Railroad*, 88 Mo. 534; *Butts v. Railroad*, 98
Mo. 272; *Hanlan v. Railroad*, 104 Mo. 381; *Dlauhi v.
Railroad*, 105 Mo. 645; *Boyd v. Railroad*, 105 Mo.
371; *Weller v. Railroad*, 120 Mo. 636; *Fleming v. Rail-
road*, 49 Cal. 253; *Chase v. Railroad*, 78 Me. 346; *Mer-
kle v. Railroad*, 49 N. J. L. 473; *Seefeld v. Railroad*,
70 Wis. 216; *Mynning v. Railroad*, 64 Mich. 93; *Man-
tel v. Railroad*, 33 Minn. 62; *Haines v. Railroad*, 41
Iowa, 227; *Mahlen v. Railroad*, 49 Mich. 585; *Benton
v. Railroad*, 42 Iowa, 192; *Railroad v. Holmes*, 3 Wash.
202; *McCrary v. Railroad*, 31 Fed. Rep. 531; *Tucker v.
Duncan*, 9 Fed. Rep. 867; *McCall v. Railroad*, 54 N. Y.
642; *Hayes v. Railroad*, 47 Mich. 401; *Schaefert v. Rail-
road*, 62 Iowa, 624.    The undisputed evidence, intro-
duced by plaintiff, in the case shows that if the
deceased had either looked or listened he could have
discovered the approach of the train in time to have
avoided the accident.    (2)    The court committed error
in excluding evidence offered by defendant to show
that deceased had been in the habit of becoming intox-
icated.    This evidence had an important bearing on
the    question    of    contributory    negligence.    If the
deceased was intoxicated at the time of the accident, he
was not in a condition to exercise that degree of care
which the law required of him.    The fact as to whether
he had been, for sometime immediately preceding the
accident, in the habit of becoming intoxicated, tended

directly to explain his condition on the night of the accident and was, therefore, admissible. *Ins. Co. v. Weide*, 11 Wall. 438; *Belden v. Lamb*, 17 Conn. 441; *Trull v. True*, 33 Me. 367; 3 Wait, Law & Pr., 272; *Budd v. Hoffheimer*, 52 Mo. 297; *Caughlin v. Haeusler*, 50 Mo. 126; *McKenney v. Dingsley*, 4 Greenleaf, 172; *Allison v. Matthieu*, 3 John. 234; *Hall v. Naylor*, 18 N. Y. 588; *Butler v. Watkins*, 13 Wall. 456; *Stolp v. Blair*, 68 Ill. 541; *Smith v. Montgomery*, 5 Mon. 502; *Dwight v. Brown*, 8 Conn. 83; *Bush v. Guion*, 6 La. Ann. 798; *Maggi v. Cutts*, 123 Mass. 535; *Chamberlain v. Enfield*, 43 N. H. 356; *Whitney v. Leominster*, 136 Mass. 25. (3) The court committed error in giving plaintiff's instruction number 1. The statute required the defendant railway company either to ring the bell or sound the whistle; but did not require both. Section 2608, Revised Statutes, 1889. By this instruction the jury was told that if plaintiff's husband was struck and killed by an engine on defendant's road on account of failure of defendant's agents and servants, either to ring the bell or sound the whistle, then the verdict should be for plaintiff. *Terry v. Railroad*, 78 Mo. 587; *VanNote v. Railroad*, 70 Mo. 642. Said instruction also told the jury that contributory negligence on the part of plaintiff must be proven by the defendant, thus practically excluding from consideration the evidence introduced by the plaintiff tending to show contributory negligence. Plaintiff's instruction number 2 is subject to the same criticism. The fact that instructions were given on the part of defendant which correctly declared the law on this subject, did not cure the error. Where the instructions are conflicting, the jury may have taken the erroneous instruction for their guide. *State v. Herrell*, 97 Mo. 105; *Spillane v. Railroad*, 111 Mo. 555; *Wilmot v. Railroad*, 106 Mo. 535; *Bank v. Hatch*, 98 Mo. 377; *Price v. Railroad*, 77 Mo. 508;

*Stevenson v. Hancock*, 72 Mo. 612. (4) The defendant did in point of fact file its bill of exceptions in time; and did in point of fact except to the action of the court in giving plaintiff's instructions. The facts are fully set forth in defendant's additional abstract; and of these facts plaintiff's counsel were fully aware when they prepared their brief, because they had before them the bill of exceptions.

*E. P. Gates, Wm. H. Wallace* and *T. B. Wallace* for respondent.

(1) The court did not err in refusing to direct a verdict for the defendant. R. S. 1889, sec. 2608; *Crumpley v. Railroad*, 111 Mo. 152; *Huckshold v. Railroad*, 90 Mo. 548; *Kenney v. Railroad*, 105 Mo. 270; *Weller v. Railroad*, 120 Mo. 635; *Petty v. Railroad*, 88 Mo. 306; *Kennedy v. Railroad*, 45 Mo. 255; *Tabor v. Railroad*, 46 Mo. 353; *Johnson v. Railroad*, 77 Mo. 546; *Cosgrove v. Railroad*, 87 N. Y. 88; *Hendrickson v. Railroad*, 49 Minn. 245; *Voak v. Railroad*, 75 N. Y. 320; *Bates v. Railroad*, 60 Conn. 259; *Norton v. Railroad*, 113 Mass. 366; *Strong v. Railroad*, 61 Cal. 326; *Railroad v. McGaha*, 19 Ill. App. 342; *Ransom v. Railroad*, 62 Wis. 178; *Wakefield v. Railroad*, 37 Vt. 330; *Hart v. Railroad*, 56 Iowa, 166; *Hahn v. Railroad*, 78 Wis. 396; *Schum v. Railroad*, 107 Pa. St. 8; *Massoth v. Railroad*, 64 N. Y. 524; *McNeal v. Railroad*, 131 Pa. St. 184; *Railroad v. McClung*, 59 Fed. Rep. 860; *Robinson v. Railroad*, 161 Mass. 148. (2) The court did not err in excluding the inquiry whether the deceased was in the habit of becoming intoxicated. Such evidence, if the defendant could have elicited any, would not have tended to prove that the deceased was intoxicated at the time of the accident. 2 Wharton on Evidence, sec. 1287; 1 Wharton on Ev., secs. 29, 40;

*Boggs v. Lynch*, 22 Mo. 563; *Thompson v. Bowie*, 4 Wall. 463; *Iron Co. v. Lundberg*, 121 U. S. 451; *Railroad v. Lee*, 60 Ill. 501; *Hampson v. Taylor*, 15 R. I. 83; *Jackson v. Smith*, 7 Cowan, 717; *Newsom v. Railroad*, 62 Ga. 339; *Railroad v. Brunson*, 63 Ga. 504; *Patrick v. Howard*, 47 Mich. 40; *Whitney v. Gross*, 140 Mass. 232; *Hatt v. Nay*, 144 Mass. 186; *Railroad v. Glasscott*, 4 Col. 270; *McGuire v. Railroad*, 115 Mass. 239; *Gahagen v. Railroad*, 1 Allen, 187; *Railroad v. Gautts*, 38 Kan. 608; *Miller v. Boykin*, 70 Ala. 469; *Tower v. Rutland*, 56 Vt. 28; *Bank v. Bank*, 60 N. Y. 278; *Wentworth v. Smith*, 44 N. H. 419; *Hays v. Railroad*, 15 Mo. App. 583.  (3) Plaintiff's instruction defining the duty of the defendant as to sounding the bell or whistle is not open to objection.  It properly declares the law.  *Crumpley v. Railroad*, 111 Mo. 152.  (4) The plaintiff's instructions on the burden of proof are not objectionable.  R. S. 1889, sec. 2608; *Huckshold v. Railroad*, 90 Mo. 548; *Crumpley v. Railroad*, 111 Mo. 152; *Murray v. Railroad*, 101 Mo. 240; *Thompson v. Railroad*, 51 Mo. 190; *Lloyd v. Railroad*, 53 Mo. 509.  (5) Appellant's abstract does not show any objection made or exception saved to the giving of the instructions on the part of the plaintiff.  The propriety of said instructions is, therefore, not raised.  (6) The appellant's abstract does not show the filing of any bill of exceptions in the case and for that reason none of the points raised by appellant can be considered.  *Johnson v. Carrington*, 120 Mo. 315; *Brand v. Cannon*, 118 Mo. 595; *Mason v. Pennington*, 53 Mo. App. 118.

SHERWOOD, J.—Plaintiff, the widow of John H. Lane, brought this action against defendant company to recover damages for the death of her husband, which was caused by his coming in contact with the engine of

a moving train of defendant's at a point in the town of Leeds where the Raytown public road crosses the track of defendant's railway.

The train at the time of the collision was moving south and Lane was going east. The date was the twenty-ninth of July, 1892, and the hour about 9:45 P. M. This intersection of the lines of the highways occurs practically at right angles, the public road running east and west, the railway north and south, and the ground for at least a quarter of a mile westward from the crossing is substantially on a level with that intersection and the roads which form it, and the same is true of the ground for over one fourth of a mile northward of the Raytown road. Something like two hundred yards north of the crossing, and extending northward along the tracks for a distance of about one hundred yards, a cut begins, which at the deepest point is but slightly over two feet deep. A diagram of the scene of the accident and of the surrounding country is hereto subjoined, and will assist in understanding the situation.

At the point of the accident and for a mile or so northward, the track of the Kansas City, Osceola & Southern Railroad (called by the witnesses the Osceola road), runs parallel to, and about sixty-five feet west of, the Missouri Pacific track. These railroad tracks on the east, and the Raytown road on the south, form an angle in which, at a distance of about one-hundred and fifty feet west of defendant's track, and something like one hundred feet north of the center of the Raytown road, stood the dwelling house of Renick. Within that angle a meadow stretches northward from that dwelling house for a distance of eight hundred and seventy feet above the crossing, and the meadow extends about one fourth of a mile westward of the Osceola road's right of way. At the north line of the

meadow begins a corn field of equal extent, and adjoining, that on the north was a woodland pasture. Between the railroad tracks mentioned were weeds growing, for a distance of one fourth of a mile, and the testimony tends to show they were, some of them, six or seven feet high, and the corn in the field from eight to ten feet high.

The only obstructions to a view of defendant's track were the dwelling house, the weeds, and the woodland pasture, in the way of a person traveling on the Raytown road, from seeing defendant's track. And at a point on the Raytown road one hundred and seventy feet west of the west rail of defendant's track, a person going eastward on that road could, as he made progress toward the crossing, continuously see that track as it stretches straight northward for a distance of eight hundred feet. There is other testimony on the part of *plaintiff* to the effect that a person if standing or sitting on a wagon, if traveling on the Raytown road and going eastward on reaching the Osceola road crossing, could readily and plainly see an engine about two hundred to two hundred and fifty yards up the track to the northward. At least four witnesses for plaintiff heard the whistle of the train on the night of the accident, a calm, still night, at the Mason crossing, one mile almost due north of the one where the accident occurred, and also heard the rumbling of the train. And it was shown by actual measurement, as contradistinguished from *guesswork* that it was eleven feet up from the rails to the lowest point of the headlight of a locomotive, and fifteen feet to its highest point, so that this would seem to readily overcome, especially if a person were on a wagon, any ordinary obstructions of the nature already mentioned. This is true of all the obstructions except Renick's house, and certainly this could obstruct the vision for only a few feet, and besides there is testi-

66
33        33        68
34        34

Cornfield.

on K. C. & S.

At 500 feet R. of W. on west side is level with track.
" 1,8 feet higher than track.

K. C. & SOUTHERN R. R.

Mo. P. R. R.

"   "   "   "   "   1,5   "   "   lower
"   "   "   "   "   0,5   "   "   higher
"   "   "   "   "   0,5   "   "
"   "   "   "   "   2,6   "   "

"   "   "   "   "   560
"   "   "   "   "   600
"   "   "   "   "   700
"   "   "   "   "   870
"   530

XXXXXX
XHouse.
XXXXXX

LEES SUMMIT ROAD.

K. C., RAYTOWN &   70 F   eet.

Lane v. The Mo. Pac. R'y Co.

A—KELLEY'S HOUSE
B—FAULKNER'S HOUSE
C—LUTHER RENICK'S HOUSE
D—W. R. RENICK'S HOUSE
E—PLACE OF ACCIDENT

mony to the effect that one hundred yards west of the Raytown crossing, that house would not obstruct the view of defendant's track.

The usual conflict occurred as to whether any signal was given for the Raytown crossing; witnesses for plaintiff claiming either that no signal was given or that they did not hear it, while those for defendant testified positively that such signal was given. No conflict, however, occurred among the witnesses as to the undisputed fact that the signal was given at the Mason crossing, which was distinctly heard by various persons at various points and at distances as great or greater from that crossing than was deceased.

No one, it seems, witnessed the accident except the engineer and the deceased. The engineer in testifying stated that the train was running at about thirty miles an hour, and thinks it was something like eighty feet to the crossing when he saw the team which seemed to be in a lope, or running away; it came in contact with the front part and side of the engine, breaking off the number plate, which is fastened in front of the locomotive; that when the team came within the rays of the headlight, they were within twelve or fifteen feet of the track; that he "just got a vision of them, that was all;" then the collision occurred. It is in evidence also that, when the body of Lane was turned over a few minutes afterwards, it was redolent of whiskey.

Deceased was a wood hauler, and frequently hauled wood to Kansas City, and had lived all his life in the vicinity of the fatal occurrence. He was thoroughly conversant with the running of trains in the neighborhood; that a great many passed that point daily, on defendant's road, and knew that the passenger train, which struck him, was due at the time. He hauled a load of cord wood to Kansas City that day, had a wood frame on his wagon, with a plank floor in it, and early

in the afternoon had passed over the crossing in question, and between 12 and 1 o'clock was two miles on toward his point of destination.

Leeds is said to be some eight miles south of Kansas City. About 4 o'clock in the afternoon, Lane was seen in a saloon; at that time he had not sold his wood, but was engaged in throwing dice for the drinks with the bartender, and within fifteen minutes, witness Lane, and the bartender took two drinks of beer each. Witness remained in the saloon about an hour and says: "I don't know how many drinks he took before I went in." "I went on down town and left John Lane there, I don't know whether they drank any more after I left or not." According to the testimony of Renick, that a team in an ordinary walk would travel about four to four and one half miles per hour, Lane must have arrived with his load of wood in Kansas City by 2:30 o'clock. Where he was, in the interim between the time of his arrival and the time he was seen in the saloon, or how he was employed, does not appear. He was next seen by Baruch, a German saloon keeper, a little after 6 o'clock, riding on his wagon with his wood unsold, and asked Baruch to buy his wood, and was, in his judgment, "perfectly sober."

Lane having disposed of his load of wood, next appears on his way homeward, a mile northwest of Leeds; this was about (as estimated) a quarter to 9 o'clock and after dark. He was lying down in the wagon; kept still, whether asleep or not witness Ryder could not tell; his horses were going along in a slow walk. The next time Lane was seen was by witness Prater, who with his brother was walking west, as Lane was going east, toward the railroad track, and the point of meeting was between Renick's saloon (where Prater and his brother had been), two hundred and seventy yards west of the crossing, and the postoffice. This

was about 9:35 to 9:40 o'clock. Lane's horses were traveling in a walk, and he was *lying down on his back, and did not have hold of the lines.* Prater thought that Lane, judging from his actions, was either asleep or drunk. The reason the witness fixes the time at that hour, was because he knew the train was due about that time, heard the train whistle about twenty yards before he met Lane, and *"noticed the train coming."* Prater spoke to Lane, and he raised up on his elbow and grunted and mumbled something, or else said, "Hello boys," and then *lay down again.*

A very short time after this, Lane was met by Brice, Cedarland, and Allen near Renick's saloon, when Allen spoke to Lane, and the latter, recognizing him, responded. Brice thinks Lane was standing up. Cedarland remembers the incident and says, "I took particular notice there was a train, because my horse was kind a scared." A little east of the saloon, that is toward the crossing, and nearer the former than the latter, Lane was met again by two others of the fishing party, Coates and Gillie. Coates says: "He was leaning on his side; I think he had his arm around one of the stakes of the wagon, or on the rack. I think he was standing up." Gillie gives similar testimony and says: "He was standing up holding to the wood rack, to my knowledge." The last person who saw Lane alive was Adkins, the barber, who was in the door of his shop, one hundred and sixty yards west from the crossing and seventy yards east of the saloon. Adkins could not tell whether Lane was sitting down or standing up, but says: "His head was above the top of the wood frame; I did not notice how high it was. He was driving slow. As near as I could tell, he had about two feet of the lines cracking at the horses."

Several photographs will accompany this opinion and tend to illustrate the situation.

Taken from center of Osceola track, forty feet south of Raytown road, camera pointing east northeast.

Taken from center of Raytown road on the Osceola crossing, camera pointing north.

Taken from point twenty steps west of Osceola crossing in center of Raytown road, camera pointing east.

Taken from a point on Osceola track about forty feet south of Raytown road, camera pointing north northeast.

The foregoing, it is believed, is a sufficiently full outline of the testimony to answer the purposes of this case.

The petition is chiefly bottomed on section 2608, Revised Statutes, 1889, as well as the negligence of defendant's servants, etc. The answer is a general denial, followed by a plea of contributory negligence, and a general denial for reply.

1. Before proceeding to discuss the merits of the case, a preliminary question must be disposed of. In order to this, however, it is only necessary to say that the additional abstract filed by defendant supplies whatever was lacking in defendant's original abstract showing that the bill of exceptions was seasonably filed and the exceptions therein properly saved to the six instructions given at the instance of the plaintiff.

2. The statute already referred to, so far as necessary to quote it, is that: "And said corporation shall also be liable for all damages which any person may hereafter sustain at such crossing when such bell shall not be rung or such whistle sounded as required by this section: *Provided, however,* that nothing herein contained shall preclude the corporation sued from showing that the failure to ring such bell or sound such whistle was not the cause of such injury."

It is insisted for defendant, that instruction number 1, given at plaintiff's instance, which refers to that statute is erroneous. We do not look at it in that light. By it, the jury in brief is told that it was defendant's servants' duty when approaching the crossing, "either to ring the bell, etc., or to sound the whistle, etc. And that if the jury believe that defendant's servants ran its train, etc., and neither rang the bell, etc., nor sounded the whistle, etc., as above required, and plaintiff's husband was struck and killed,

etc., on account of such failure, etc., either to ring the bell or sound the whistle as above required, then you will find a verdict for plaintiff, unless defendant has proven, etc., that Lane was guilty of negligence which contributed to his death." Under such an instruction it is difficult to see how the jury could be so misled as to suppose that defendant's servants would be required to give *both* signals of warning when approaching a crossing.

3. Complaint is also made that instruction number 2, of those for plaintiff, is erroneous because it told the jury "that the burden of proving contributory negligence on the part of John H. Lane, rests on the defendant, and unless the defendant has proven such contributory negligence by a preponderance of the evidence you can not find for the defendant on that ground." The objection to this instruction is that it leaves out of view evidence which was offered on plaintiff's part tending to show contributory negligence. We do not sanction this objection. The instruction is well enough so far as it goes, and if defendant desired to cover the point suggested, an instruction should have been asked to that effect.

4. It is insisted that evidence should have been admitted, showing Lane to have been a man given to the habit of intoxication. If this evidence was relevant, then it should have been admitted. It is said that: "Relevancy is that which conduces to the proof of a pertinent hypothesis; a pertinent hypothesis being one which, if sustained, would logically influence the issue. * * * a prairie is fired, it is said, by a passing locomotive; the hypothesis of the plaintiff is that the firing was by negligence, and for the plaintiff all the conditions of negligence are relevant. The defense sets up *casus*, or contributory negligence; and then, on the part of the defense, it is relevant to prove the con-

ditions of either of the latter hypotheses. Hence, it is relevant to put in evidence any circumstance which tends to make the proposition at issue either more or less improbable. Nor is it necessary at once to offer all the circumstances necessary to prove such proposition. The party seeking to prove or disprove the proposition may proceed step by step, offering link by link. Whatever is a condition, either of the existence or of the nonexistence of a relevant hypothesis, may be thus shown." 1 Whart., Ev. [3 Ed.], secs. 20, 21, and citations. Numerous cases attest the correctness of this position, and quite a number have been collected in the brief of counsel.

The charge of the petition is negligence of defendant in failing to give certain statutory signals and negligence in running and managing the train, and from which resulted the litigated injury. To this charge a denial is interposed, as well as a plea of contributory negligence. Any evidence, therefore, was relevant which tended, even though slightly, to induce belief in the truth of the charges or in the truth of the denial or plea.

Thus in *Trull v. True*, 33 Me. 367, it was held that testimony can not be excluded as irrelevant which would have a tendency, however remote, to establish the probability of the fact in controversy.

Lord ELLENBOROUGH on one occasion remarked that, "the rules of evidence must expand according to the exigencies of society." 3 Camp. 306.

In *Ins. Co. v. Weide*, 11 Wall. 438, it was ruled in a case of a suit on a policy of insurance against loss of a stock of groceries in process of retail sale, by fire, it is competent to show by witnesses in the town where the fire occurred, engaged in the same business with the plaintiffs, and whose annual sales were as large, that grocery merchants in that city for the six years

prior to the fire had not carried, or had on hand, at any one time, more than one fifth of their annual aggregate sales, and that this was the case on the day the fire occurred.

Mr. Justice DAVIS after adverting with approval to the remark of Lord ELLENBOROUGH, but disclaiming in the case then in hand any innovation upon familiar rules of evidence, observed: "It is well settled that if the evidence offered conduces in any reasonable degree to establish the probability or improbability of the fact in controversy, it should go to the jury. It would be a narrow rule, and not conducive to the ends of justice, to exclude it on the ground that it did not afford full proof of the nonexistence of the disputed fact. Besides, presumptive evidence proceeds on the theory that the jury can infer the existence of a fact from another fact that is proved, and most usually accompanies it. Many of the affairs of human life are determined in courts of justice in this way  *  *  * In the nature of things, the officers of the insurance company were unable, by any direct proof, to contradict, the testimony of the plaintiffs as to the value of the goods destroyed.  *  *  *  As they had no direct evidence to produce bearing on the subject, they offered to prove a fact which, uncontradicted and unexplained, would lead the jury to the conclusion that the plaintiffs had overvalued the property destroyed by fire. It was neither opinion nor hearsay which they tendered to the court,  *  *  *  but a matter of fact concerning the business in which the plaintiffs had been employed, which would render it extremely improbable that they had sustained the loss they claimed to have suffered.  *  *  *.

"If this state of case could be proved by the united testimony of this class of merchants, it would establish a fact connected with this kind of business, to wit, the

uniform relation between the stock on hand and the annual sales, from which the existence of another fact could be reasonably inferred, which is, that the business of the plaintiffs rested on the same basis and was governed by the same rule of uniformity. Indeed, so strong would be this inference, that in the absence of any attempt to explain or contradict the evidence, the jury would be justified in adopting the conclusion which it tended to prove. A presumption is an inference as to the existence of a fact not actually known, arising from its usual connection with another which is known, and on this principle the jury should have been allowed to consider this evidence.''

It is noteworthy that the opinion in the case just cited was delivered by the same judge in *Thompson v. Bowie,* 4 Wall. 463, wherein it was in effect held that because Bowie gambled at other times when in liquor, was no legal proof that because he was in liquor on another day that he gambled with Steer. The distinction between the two cases, and the reason for the distinction, seem quite obvious.

Repeated instances occur in the books where it has been ruled that the intoxication of a person injured is a fitting subject of inquiry in order to determine whether he had been guilty of contributory negligence on the given occasion, and hence his injury was non-actionable. Whart., Neg., secs. 306, 307, 332, 402.

In an action against a town for an injury alleged to have been occasioned by a defect in a highway, and the plaintiff, at the time of the accident, was intoxicated; and the court instructed the jury that if he were so intoxicated as to be incapable of managing and conducting himself and his team with ordinary care and prudence, then he could not be said to be in the use of ordinary care; and if this want of ordinary care contributed in the slightest degree to produce the injury

complained of, the plaintiff was not entitled to recover; and it was held that herein there was no error. *Cassedy v. Stockbridge*, 21 Vt. 391.

Cramer brought suit against the city of Burlington for injuries received while on the streets, he being precipitated over a set-off in a sidewalk of defendant, left in a dangerous condition and not sufficiently guarded. The city denied the allegations of the petition, alleged that plaintiff was out late at night in a state of intoxication, and that whatever injuries he sustained resulted from his own carelessness and negligence. It was in evidence that plaintiff on the evening of and before the accident had drunk several glasses of beer. And it was there ruled that, while being abroad in the streets of a city in an intoxicated condition is not negligence *as a matter of law*, it is nevertheless a circumstance from which the jury may find the existence of negligence as *a matter of fact*, and that it is not necessary, after the fact of intoxication has been found, that the jury should further find, as a result thereof, that the plaintiff became careless and reckless in regard to his safety, to defeat his recovery. With all the care of which he was capable in that condition, he may still have contributed to his own injury. 42 Iowa, 315.

And the law is well settled that an action lies against a railway company by a person on one of its trains, which retains in its service a conductor known by the company to possess intemperate habits.

In *Railroad v. Books* it was claimed that the lower court erred in admitting testimony touching the habits and competency of the conductor of a coal train which ran into a passenger train and caused the injury. On this point SHARSWOOD, J., remarked: "This assignment of error was not pressed, and properly. If, by direct evidence, it appeared that the conductor was a man of intemperate habits, it would cast upon the de-

fendants the burthen of proving that he was not intoxi-
cated at the time, and had used proper care. It is certainly
incumbent upon railroad companies to employ none
but sober men on their roads. Where a habit of intox-
ication in a conductor is shown, it raises, in the case
of an accident, a presumption of negligence, which
stands until it is rebutted." 57 Pa. St., *loc. cit.* 343.
See, also, *Railroad v. Decker*, 82 Pa. St. 119; 84 *Id.*
419; *Railroad v. Sullivan*, 63 Ill. 293; *Railroad v. Gil-
bert*, 46 Mich. 176; *Cleghorn v. Railroad*, 56 N. Y. 44;
*Gilman v. Railroad*, 13 Allen, 433; Patterson, R'y
Accid. Law, 314.

On suitable occasions the general character and
habits of a *horse* may be inquired into, and it has been
ruled in one instance on action for damages that the
rejection of such evidence of occurrences *after* the acci-
dent was reversible error, notwithstanding evidence of
such habits prior to the accident had been freely
admitted, LORD, J., saying: "The question is, not
whether the evidence was sufficient to prove the fact in
the opinion of the court, but whether it was evidence
proper for the jury to consider, and upon which they
might be authorized to find the fact * * * The
court should be very slow to say that any evidence
which is competent upon a question decided against a
party is immaterial, and never unless the whole evi-
dence is presented, and the question of its sufficiency
distinctly raised." *Maggi v. Cutts*, 123 Mass., *loc. cit.*
540.

In states where criminal prosecutions occur because
of habitual drunkenness, it has been decided that proof
that one has been drunk from five to seven times on as
many different days within a period of between three
or four months, with no other evidence of his condition
at other times, will justify a jury in convicting him
as a common or habitual drunkard, and that he is not

entitled to a specific ruling and instruction that he is affirmatively to be presumed sober, on days as to which no evidence is offered.    *Com. v. McNamee*, 112 Mass. 285.

These quotations serve to show, and, it seems, very clearly, that evidence tending to show intoxication in a single instance may go to the jury and justify the inference by them of a want of ordinary care, or negligence, and that the habit of intoxication when once proven to exist is presumed to continue, and raises in the case of an accident a presumption of negligence which stands until rebutted.

Inasmuch as these things must be taken as conceded, it would seem to leave no room to doubt that evidence ought to have been admitted in the case at bar to show the habit of Lane in the particular mentioned.    Indeed, it may be said that there was some evidence indicating his intoxication at the time of the fatal occurrence.    But, however this may be, if evidence of the intemperate habits of a conductor of a railroad company may be gone into, in order to charge his employer with his negligence in case of an accident, though no intoxication be shown on that particular occasion, it is difficult to see why in fairness and upon principle the like rule should not prevail, and similar evidence be admitted, and similar consequences follow, where a railroad company pleads the contributory negligence of one injured by its train.

5.    Putting aside, however, all other matters previously discussed, the heart of this cause lies in response to the question, does the evidence support the verdict? We are not of opinion that it does, and for these reasons:

The testimony has been heretofore sufficiently set forth, and it shows with unmistakable clearness that if Lane had listened he could have heard the train; if he

had looked he could have seen it.   There is no sort of question about this, even if we take the lowest estimate at which the headlight of a coming locomotive could be first seen, to wit, about sixty yards, by a person standing on the ground thirty yards west of the Osceola track, which would be some one hundred and fifty-five feet west of defendant's track, and place of the accident.

If Lane was at that point, and traveling at four miles an hour he would go over ground at the rate of not quite six feet per second, but the train at thirty miles per hour would travel at the rate of forty-four feet per second.   So that the train first coming into view at a distance of only sixty yards, or one hundred and eighty feet, from the crossing, would reach that point in a slight fraction over four seconds, but meanwhile Lane would not have gone over but twenty-four feet; this would have left him one hundred and thirty-one feet to travel before he could get an opportunity to reach the crossing and collide with the train.   But if we take the uncontradicted testimony of Prater, who met Lane west of the saloon, the saloon being two hundred and seventy yards west of the crossing, and had noticed the train coming twenty yards before he met Lane, and if we take the unchallenged testimony of Cedarland, whose horse was frightened by the approaching train, and who met Lane just about opposite the saloon, then the facts are still more unfavorable to the theory and contention of the plaintiff.   And if we increase the distance at which an approaching headlight could be seen, this only increases the difficulty of maintaining plaintiff's position, because it would have afforded a larger opportunity to Lane to have seen the approaching train and avoided the danger of attempting to cross the track.

And, in this connection, it must not be forgotten that careful measurements were taken by Grinder, the county surveyor, of the distance to the south line of

the cornfield, the depths of the cuts and the points at which they began, and other measurements, and other careful examinations. Such methods of patient ascertainment of the physical surroundings are scarcely to be brought into serious comparison with *estimates* made by men who after night stood one hundred and fifty, to two hundred, feet west of the track, looking at the headlight of the locomotive *coming straight toward them*, *guessed* how far distant it was when it first came in sight. That these were *guesses* is shown by the unanswerable fact that they vary in distance in the particular mentioned from sixty to one hundred, one hundred and fifty, two hundred, and two hundred and fifty yards.

And then it should be borne in mind that Lane, when standing up in the wagon, had an altitude of vision about nine feet above the earth's surface. When to this is added for consideration the fact that the top of the headlight by actual measurement was fifteen feet above the rails, the conjunction in effect of these two altitudes was sufficient to overcome the deepest cut or the highest weeds or embankment that any of the witnesses have spoken of, certainly so when the train reached a point some eight hundred feet northward of the crossing.

Besides, it is not to be overlooked that Lane was a resident of the vicinity, perfectly conversant with the running of the trains and knew that the train was then due. Every dictate of prudence, every consideration of personal safety, therefore, imperatively demanded that he look and that he listen.

The result, in the light of the testimony surrounding his unfortunate death, satisfies us that he neglected the most obvious precautions, and that in consequence of such neglect, the defense of contributory negligence was fully made out.

In *Stepp v. Railroad*, 85 Mo. 229, BLACK, J., deliv-

ering the opinion of the court, said: "It has been repeatedly held by this court that it is the duty of one crossing a railroad track to look and listen for an approaching train, and thus get all the information his eyes and ears will afford him, and if he fails to do this and thereby contributes to the injury, he must suffer the consequences, even though the company may have been derelict in the performance of its duty in giving the signals." To like effect, see *Hixson v. Railroad*, 80 Mo. 340; *Kelly v. Railroad*, 88 Mo. 534; *Lenix v. Railroad*, 76 Mo. 86; *Purl v. Railroad*, 72 Mo. 168; *Henze v. Railroad*, 71 Mo. 636; *Harlan v. Railroad*, 64 Mo. 480; *Zimmerman v. Railroad*, 71 Mo. 476; *Kelley v. Railroad*, 75 Mo. 138.

It is unnecessary to pursue this subject further, since it has so often before and so recently received discussion in the cases of *Hayden v. Railroad*, 124 Mo. 566, and *Kelsay v. Railroad*, 129 Mo. 362, where, in circumstances substantially identical with the present case, a like conclusion was reached.

In the latter case, MACFARLANE, J., speaking as the organ of the court, approvingly makes the following quotation: "It is simply and flatly impossible that one can stop, look, and listen for an approaching train that is in plain view and close at hand and be unable to see or hear it, if he possesses the senses of sight and hearing. It seems, therefore, necessary to advance one step in the application of the doctrine of legal presumption, and to lay it down as a rule that one who is struck by a moving train which was plainly visible from the point he occupied when it became his duty to stop, look, and listen, must be conclusively presumed to have disregarded that rule of law and of common prudence, and to have gone negligently into an obvious danger. A line of well considered cases

leads fairly up to this conclusion." *Myers v. Railroad*, 24 Atl. Rep. (Pa.) 747.

6.    Something has been said about the team running away at the time they were struck by the locomotive. There is nothing to show that this result, if true, was brought about by any act or omission of defendant's, and in the absence of such evidence we shall not on a mere surmise or conjecture, hold defendant responsible therefor.

The corollary from the foregoing remarks is the reversal of the judgment, and it is so ordered, BARCLAY, J., dissenting, in the remainder of the opinion. The other judges concur except in paragraph 4, in which no one concurs.

BARCLAY, J. (*dissenting*).—My concurrence is not given to the ruling that plaintiff has no case to submit for trial.

Defendant does not deny that there was evidence warranting a finding of its negligence in omitting to give a statutory signal, on approaching the crossing. Under the statute (section 2608, R. S. 1889) proof of such omission and of the accident following at the crossing make out a *prima facie* case (*Crumpley v. Railroad*, 1892, 111 Mo. 152, 19 S. W. Rep. 820), unless, of course, plaintiff's evidence also shows, as a conclusion of law, that the omission of a signal was not the cause of the injury, as that statute fairly intimates.

But the result of the judgment of my learned colleagues here is to declare that the evidence permits no other reasonable inference than either that the deceased was negligent as a matter of law, or that the omission of the statutory signal of the coming train could not reasonably be found to be the cause of Lane's death.

1. As to the negligence of Lane.

Many of the facts in evidence have, no doubt, a strong tendency to prove contributory negligence on his part.    But the precise legal questions as to Lane's negligence which the record raises at this stage of the action are, first, whether or not the facts in evidence exclude any other reasonable conclusion than that he was negligent; and, secondly, even if defendant's evidence is held uncontradicted, whether the question of its credibility or sufficiency (to support the defendant's plea of contributory negligence) is not a question for the jury to decide, as an incident of the right of trial by jury guaranteed by the Missouri constitution, in view of the statute above cited which casts the burden of proof on defendant where there has been an omission of a statutory signal and an injury following, which may reasonably be found to have been caused by that omission.

Let us examine the statement of defendant's locomotive engineer to see if it affords ground for a fair and rational inference that Lane was not negligent in conduct at, and immediately before, the time of the collision.

The engineer testified that he was at his post in the cab, on the right (or west) side of the locomotive.

His account (on his direct examination) of the performance of Lane and of his team, is as follows:

"The first thing I saw of Mr. Lane or the team was that I saw the team when we were about seventy-five or eighty feet away.    It is very hard and difficult to tell the exact distance of a train when you are running after night.    As soon as the headlight shone on the grass I saw the team and they were on the run.    Just as soon as I saw the team, I put on the emergency to stop the train.    I did not have time to whistle the alarm whistle, or anything, until the team and engine

came together. From the appearance of the engine, they struck near the front end of the engine. I stopped the train just as soon as the brakes would stop it. I should judge that it ran about five hundred feet after it struck the team. I did not see the wagon, I just saw the horses. I should judge when I first saw the team it was within ten or fifteen feet of the track, and the engine was about seventy-five feet from the crossing. It was a dark night. I don't think, running at the rate of speed I was that night, you could discern an object over one hundred and fifty or two hundred and fifty feet ahead of you. I should think that the headlight would cast its rays from fifteen to twenty feet on either side of the track." * * * *
"It has a tendency to blind. It makes it more difficult to see an object outside of the rays of light. Just as soon as the train stopped, I notified the conductor and train porter, and we went back to the crossing. There was the cattle guard there, and both the horses and the man were carried clear over the cattle guard— knocked clear over, inside of the right of way fence; but I could not tell what distance. The number-plate on the front end of the engine was broken, and there was one of the rod-cups broken on the forward pin. There was blood and hair between the bumper-beam and forward cylinder on the right hand side. The bumper-beam projects at the head of the cylinder. There is twenty-four inches space between the steam chest and the bumper-beam." * * *

On cross-examination he stated that he "took it that *the team was running away* at the time that it was struck;" and that the indications on the engine showed "that the first horse caught between the bumper-beam and the cylinder" of the locomotive.

The above testimony was given on behalf, and at the instance of, defendant. But in considering whether

or not plaintiff has made out a case to go to the jury, it is proper to give plaintiff the benefit of all the facts, and of every reasonable inference that they will bear, at the time that question arose and was finally ruled upon; which in this case was at the close of all the testimony.

It is not necessary to enter upon an extended discussion to establish that if Lane's team bolted and ran into the train while beyond control of the driver, the latter can not justly be charged with contributory negligence on that account. *Johnson v. Railroad* (1883) 77 Mo. 546; *Hendrickson v. Railroad* (1892) 49 Minn. 245 (49 N. W. Rep. 1044) and (1893) 52 Minn. 340 (54 N. W. Rep. 189).

Nor does it matter that a jury of judges trying the facts might conclude from a review of all the evidence that the deceased was careless. If the evidence reasonably permits the inference or finding that Lane used ordinary care for his own safety then it is for the constitutional triers of the facts (the jury, in this case) to determine the issue as to his care. They did decide that Lane was not negligent, in response to several instructions, some offered by defendant, others by the plaintiff.

No other person at the trial besides the engineer described the actual collision. On his statement it is my opinion, with due respect, that the deceased should not be pronounced conclusively negligent as a matter of law. It is unnecessary to conjecture what the proper ruling should be if the engineer's testimony were out of view. It is in the case, and plaintiff is entitled to the benefit of it.

2. As to the causal connection between the absence of any signal from defendant's train, and the death of Lane.

If Lane got so near to the crossing as to be unable

to avoid the results brought on by the fright of his team at the sudden apparition of the headlight and locomotive, and if the facts reasonably warrant the inference that his close approach to the track would not have occurred had defendant given one of the required signals to warn him of the coming train, while at a safe distance from it, then the omission to give such a signal might legitimately be found to be the cause of the running away of the team and of the consequences ensuing.

The facts seem to me to fairly permit those inferences. If they do, then the *prima facie* case, made out under the statute (section 2608) by plaintiff's showing, was not destroyed by the evidence for the defendant (irrespective of any examination of its credibility), since the latter evidence certainly warrants the inference that Lane came into collision with the engine without voluntary action on his part.

Under the instructions the jury found as a fact that Lane's death resulted from the failure to give a required signal.

3. In view of the foregoing, it is unnecessary to discuss the proposition that the jury would also have to pass on the issue of contributory negligence under the statute (2608), even if defendant's uncontradicted evidence excluded any other inference than that of such negligence on the part of Lane. The credibility of that evidence would still be for the jury. My views on that point sufficiently appear in opinions in *Schroeder v. Railroad* (1892) 108 Mo. 323 (18 S. W. Rep. 1094) and *Church v. Railroad* (1893) 119 Mo. 222 (23 S. W. Rep. 1061); but the statement of the engineer in the case at bar make that proposition of small importance in reaching a result on this appeal.

4. On the interesting question of evidence discussed in the fourth paragraph of my learned col-

league's opinion, it seems to me that no ruling need now be given, because the point is not presented in a manner to require it.

The exact (and only) terms of the record on this subject are shown by the following passage from the testimony of the witness (Mr. Parish) during whose examination the point arose, viz:—

"I had taken a couple of drinks with him and left him there, and did not see him any more until after he was killed.

"Q. Were you acquainted with his habits? A. Yes, sir; I have run with him all his life.

"Q. Had he been in the habit during the summer of taking a dram?

"Objected to by the plaintiff as incompetent. Objection sustained by the court and defendant excepted.

"Q. Do you know whether or not Mr. Lane was in the habit of becoming intoxicated recently, prior to this accident, and during the summer before this accident?

"Objected to by plaintiff as incompetent. Objection sustained by the court and defendant excepted.

"The passenger train was due there at 9:45. I could not say how many passenger trains pass out over that road at night," etc.

The third question quoted merely called for the knowledge of the witness concerning Lane's habits. It had been already answered in response to the first of these questions.

The exclusion of a reply to the inquiry as to Lane's "habit during the summer of taking a dram" could scarcely be considered prejudicial error, in view of the abundant testimony of various witnesses that he drank with them at divers times on the very day of the accident.

Vol. 132 mo—3

If defendant wished to prove that Lane was in the habit of becoming intoxicated, some further offer of testimony should have been made beyond anything shown by the record above quoted. It is not sufficient to merely throw out a suggestion of a line of testimony. If a party making a suggestion intends to press the matter to the point of review on appeal, he must follow up the suggestion in some proper way, so that the reviewing authority may see that something really material and competent was kept out. *Bank v. Aull* (1883) 80 Mo. 199; *Jackson v. Hardin* (1884) 83 Mo. 175; *State v. Martin* (1894) 124 Mo. 514 (28 S. W. Rep. 12).

As the above cases hold, a judgment should not be reversed on a mere conjecture of further possible evidence.

5. The instructions discussed in the learned opinion of the court in banc have been found free of fault; and no error of any sort in the proceedings at the trial has been pointed out in that opinion, except the ruling on the general merits of plaintiff's cause of action.

As the case seems to me one proper for submission to the jury, my vote is for the affirmance of the circuit judgment.