SANGUINETTE v. MISSISSIPPI RIVER & BONNE TERRE RAILWAY COMPANY, Appellant.

Division Two, May 22, 1906.

1. **APPEAL: Abstract: Mingling Record and Exceptions.** The abstract does not set forth in regular order everything which was matter of record as distinguished from matter of exception, yet when taken altogether it sets forth so much of the record as is necessary to a full and complete understanding of all the questions presented on appeal for decision, the only objection being that it does not clearly separate record entries from matters incorporated in the bill of exceptions. *Held*, that there having been no motion filed to affirm judgment or dismiss appeal because of failure to comply with the rules, the contention made in argument and brief that the appeal should be dismissed is not sustained.

2. **NEGLIGENCE: Crossing Railroad.** A railroad track is itself a warning of danger, and one who attempts to cross it must act with care proportionate to the danger and not suffer his attention to be diverted from the danger before him, and to keep his faculties in active exercise. Mental absorption or reverie will not excuse the traveler who omits to perform the duty of looking and listening.

3. ———: ———: **Obstructions: Ringing Bell: Conflict in Testimony.** Deceased and his son and another were returning from threshing wheat about 6:30 o'clock of an August evening. They approached a country railroad-crossing in an ordinary farm wagon, the son driving, the other on the seat beside him, and deceased sitting behind smoking. On the side of the track were horse weeds ten or twelve feet high, and plaintiff's witnesses testified that these weeds obstructed the view until the traveler was on the railroad track, but defendant's witnesses testified that after the weeds were past there was a space of more than 30 feet from which a train could be seen four or five hundred feet away, and the man sitting beside the driver testified that he saw the train 90 feet from the crossing and before the horses stepped upon the track. The plaintiff's witnesses testified that they heard no bell and that the whistle tooted just as the train, which was an hour late, struck the horse, but many witnesses for defendant testified that the whistle was sounded three times about 1400 feet away and the bell was rung. There was no evidence that the wagon stopped, or that the driver or deceased looked or listened for the train, which was running more than thirty miles an hour. They were familiar with the crossing and had traveled over it frequently. *Held*, that deceased was guilty of contributory negligence, and as there was no proved negligence on the part of the defendant, for the evidence was conflicting as to the allegation of failure to ring the bell or sound the whistle, plaintiff cannot recover.

Appeal from Jefferson Circuit Court.—*Hon. Frank R. Dearing*, Judge.

REVERSED.

*Edward A. Rozier, Jno. H. Malugen* and *James F. Green* for appellant.

(1) The evidence disclosed a clear case of contributory negligence on the part of deceased, which precludes plaintiff's recovery. Hayden v. Railroad, 124

Mo. 566; Kelsay v. Railroad, 129 Mo. 374; Hook v. Railroad, 162 Mo. 569; Turner v. Railroad, 74 Mo. 607; Hickman v. Railroad, 47 Mo. App. 74; Lane v. Railroad, 132 Mo. 16; Jones v. Railroad, 63 Mo. App. 508; Payne v. Railroad, 136 Mo. 581; Guyer v. Railroad, 174 Mo. 344.    (2)   There is no evidence that either deceased or the driver of the wagon looked or listened for approaching trains, and no presumption can be indulged that did.   Jones v. Railroad, supra; Hook v. Railroad, supra; Beach, Cont. Neg. (2 Ed.), sec. 182; Myers v. Railroad, 24 Atl. 747; Turner v. Railroad, supra; Lynn v. Railroad, 79 Mo. App. 478; Hickman v. Railroad, supra; Lockwood v. Railroad, 65 N. W. 866; Morris v. Railroad, 26 Fed. 22; Mackowitz v. Railroad, 186 Mo. 350.   (3)   The photographs show that when the train was from two hundred to four hundred and twenty-five feet south of the crossing it could be seen by those in the wagon, from twenty-five to sixty-eight feet west of the crossing.   Physical facts cannot be ignored. Kries v. Railroad, 148 Mo. 330; Barrie v. Railroad, 102 Mo. App. 91; Lane v. Railroad, 132 Mo. 17; Lien v. Railroad, 79 Mo. App. 479; Payne v. Railroad, 136 Mo. 583.

*H. B. Irwin* and *Byrns & Bean* for respondent.

(1)   This case ought to be dismissed and stricken from the docket because appellant has wholly failed to comply with rules 11 and 13 of this court in the following particulars, to-wit:   Appellant has not filed in this court an abstract of the record, setting forth so much of the record as is necessary to a full and complete understanding of the questions presented in this court for decision, nor has he served the respondent with a copy of the abstract of the record within thirty days before the day on which the case is set for hearing, nor has he served such copy to this date.   Butler County v. Graddy, 152 Mo. 443; Warehouse Co. v. Glasner,

150 Mo. 426; Lawson v. Mills, 150 Mo. 428; Hughes v. Henderson, 95 Mo. App. 312; St. Charles v. Deeman, 174 Mo.122; Walser v. Wear, 128 Mo. 652; Bailey v. McWilliams, 111 Mo. App. 37; Rule 16; Machine Co. v. Crawford, 98 Mo. App. 323; Brand v. Cannon, 118 Mo. 595; Halstead v. Stone, 147 Mo. 649.  (2)  Where a party crossing a railroad track cannot see an approaching train because the view is obstructed and there is nothing to prevent his hearing a train, he is not as a matter of law required to stop before going on the track.  Even if he could not see an approaching train but had heard the rumbling of a train in the distance and did not hear a bell or whistle, he would have been warranted in assuming that the train was more than eighty rods from the crossing and that he could cross the track in safety.  Riska v. Railroad, 180 Mo. 189; Petty v. Railroad, 88 Mo. 306; Crumpley v. Railroad, 111 Mo. 152; Hutchinson v. Railroad, 161 Mo. 246; sec. 1102, R. S. 1899; Johnson v. Railroad, 77 Mo. 546; Donahue v. Railroad, 91 Mo. 359; Elliott v. Railroad, 80 S. W. 270.  Where the traveler was in a position to have heard the whistle or bell, he is not required to stop his team and go forward on foot to see whether a train is coming.  Elliot v. Railroad, 80 S. W. 270; Russell v. Receiver, 70 Mo. App. 95; Kenney v. Railroad, 105 Mo. 270.  (3)  Appellant cites certain cases as to when it is proper to give a peremptory instruction. We submit the following propositions as the correct rule as to sustaining a demurrer to the evidence:  In passing on a demurrer to the evidence not only the truth of the facts shown, but every inference of fact which the evidence warrants and which the jury with propriety might make, must be made in favor of the plaintiff.  Twohey v. Fruin, 96 Mo. 109. (4)  The court in passing on such demurrer is not at liberty to make inference of fact in favor of the defendant to countervail or overthrow either presumptions of law or inferences of facts in favor of the plaintiff.  That would be

clearly usurping the province of the jury. The presumption of due care is always indulged in favor of the plaintiff in an action to recover damages for negligence, unless it conclusively appears from the evidence adduced by plaintiff, either by direct or cross-examination, that plaintiff was guilty of contributory negligence. Crumpley v. Railroad, 111 Mo. 152; Petty v. Railroad, 88 Mo. 306; Weller v. Railroad, 164 Mo. 199. And when plaintiff makes a prima facie case, although defendant's evidence is not contradicted, it is still the duty of the court to refuse a peremptory instruction, as it is the province of the jury to pass on the evidence. Because, as provided by the Constitution: "The right of trial as heretofore enjoyed shall remain inviolate." Gannon v. Gas Co., 145 Mo. 516. (5) Appellant contends that certain photographs are of themselves independent and primary evidence. Photographs are secondary evidence, like maps and drawings, and their probative force is to be determined by the jury. Baustian v. Young, 152 Mo. 323. (6) Ordinary care at a railroad crossing requires the traveler to look both ways and listen for coming trains. That rule is relaxed where the circumstances are so complicated as to deceive the traveler and throw him off his guard, and it is a question for the jury to say whether he used ordinary care. Baker v. Railroad, 122 Mo. 533, 147 Mo. 140.

BURGESS, P. J.—This an action by plaintiff for five thousand dollars damages on account of the death of her husband, Henry A. Sanguinette, who was killed on the 16th day of August, 1902, through and by reason of the alleged negligence of defendant.

The petition of plaintiff, leaving off the formal parts, is as follows:

"Plaintiff states that the defendant is and was at all the times hereinafter mentioned a corporation organized under the laws of the State of Missouri, owns and operates a line of railway from Riverside in Jef-

ferson county, to Doe Run in St. Francois county, all in the State of Missouri. Plaintiff states that she is the widow and survivor of Henry A. Sanguinette, deceased.

"Plaintiff states that the tracks of defendant are laid across a certain public highway in said Jefferson county, being known as the county road leading from Festus to Rush Tower in said county; that said crossing is at a point on defendant's road immediately south of its station known as Genevieve; the tracks of defendant at said crossing being on a grade a few feet higher than the natural level of the ground at that point and higher than the level of the county road on either side of said tracks, so that persons using said county road at that point are compelled to go up the grade aforesaid to get onto the tracks of defendant.

"Plaintiff says that on the 16th day of August, A. D. 1902, while her husband, Henry A. Sanguinette, now deceased, was being driven and lawfully riding in a two-horse farm wagon along and upon said highway at the point of crossing defendant's tracks as aforesaid, a certain locomotive and train of cars were driven along and upon said railroad of defendant up to, upon and across said public highway at the said crossing thereof, and the agents and servants of defendant in charge of said locomotive and train of cars wholly failed to ring the bell thereon at a distance of eighty rods from said crossing and to keep the same ringing until said locomotive had crossed said highway, and also wholly failed to sound a steam whistle at the distance of eighty rods from said crossing, and to sound the said whistle at intervals until said locomotive had crossed said highway, by means and in consequence of which default and neglect of defendant's said servants and agents said locomotive ran and struck with great force and violence upon and against the two-horse wagon aforesaid in which her said husband was riding and the same was overturned, broken and crushed, and her said husband was with great

force and violence thrown from and out of said two-horse farm wagon to the ground, or into the cattle-guard of defendant, that he was instantly killed, his neck was broken and his body otherwise badly bruised and crushed.

"Plaintiff says that by reason of the premises she has been damaged in the sum of five thousand dollars, for which she prays judgment."

Defendant's answer was a general denial and a plea of contributory negligence on the part of deceased, to which answer there was a replication denying generally new matter therein pleaded.

The trial before the court and jury resulted in a verdict and judgment for plaintiff for five thousand dollars. Defendant appeals.

Defendant's road, known as the Mississippi River & Bonne Terre Railway, extends from Doe Run in St. Francois county, in a northerly direction to Riverside, in Jefferson county. There is a road crossing this railway, known as the Ste. Genevieve road, running in an easterly direction, and crossing the railroad at a point a short distance south of Genevieve station. On the day of the injury, the deceased, Henry Sanguinette, his son, James Sanguinette, and V. E. Cannopa were driving east on this public road; it was about six o'clock in the afternoon of the 16th of August, 1902; Cannopa and James Sanguinette sat on the front seat of the wagon and Henry Sanguinette immediately behind them; James occupied the driver's seat and Cannopa sat on his left. Henry Sanguinette owned one of the horses in the team and Cannopa the other. They had been engaged threshing during the week and were on their way home, they living some distance east of the crossing. It was in the testimony that all the parties were familiar with the crossing, having driven over it on several occasions, and that they also knew the usual time of the train passing north. On this occasion the train was about an hour late and was running, perhaps, thirty-five miles

an hour. As the team was going over the crossing it was struck by the train.

On the part of the plaintiff, the following testimony was offered:

Katie Sanguinette, the plaintiff, testified that she was the widow of Henry Sanguinette, who was forty-three years old at the time of his death; that his hearing and eyesight were good; that in going to Festus, Missouri, he used the road known as the Ste. Genevieve road, which crossed the Mississippi River & Bonne Terre railroad; that he had lived in that neighborhood all of his life and traveled the road on an average of once a week.

V. E. Cannopa testified that during the week prior to the death of Henry Sanguinette he (the witness) had worked with him; that they were engaged in threshing. On their way home on Saturday afternoon of the accident, he and young James Sanguinette and Henry Sanguinette, the deceased, rode together in an ordinary farm wagon, James, who was about nineteen, sitting in front on the driver's seat to the right, and witness to his left, Henry Sanguinette sitting immediately behind them; that they got to the Genevieve crossing about 6:30 in the afternoon; that all three of the parties were familiar with the crossing; the horses were in a walk and were going about two and one-half or three miles an hour; that when they got up near the railroad he looked for a train, but saw none and then continued to drive on; they did not stop at any time; that they were right on the crossing when they discovered the train; that the engine struck the front wheels of the wagon; that he did not hear any whistle or bell; that his hearing and eyesight were good; that Sanguinette's boy was driving the wagon; one of the horses in the team belonged to Henry Sanguinette, and the other one to witness; that as they were driving toward the track there was a big lot of weeds there and when he was past the weeds he

saw the train, and it was too late to jump. The testimony as to the weeds being on the right of way was objected to by defendant. On cross-examination the witness was asked the following questions:

"Q. You did see a train that day, Mr. Cannopa? A. Yes, sir, after I had approached the track when it was about thirty yards away.

"Q. You say you saw the train when it was thirty yards from the crossing? A. After we got on the crossing it was about the trestle.

"Q. You say that was about thirty yards away? A. Yes, sir.

"Q. You say the horses were going up to the crossing? A. Yes, sir, they were going upon the crossing.

"Q. The horses were going upon the crossing when you looked up and saw a train? A. Yes, sir.

"Q. The train at that time was at this little trestle, or bridge, about here (indicating on photograph), about thirty yards south? A. Yes, sir.

"Q. South of the crossing? A. Yes, sir.

"Q. And the team was going up on to the crossing? A. Yes, sir, just approaching, got up about on it.

"Q. Well, had you looked for a train before that? A. We was sitting facing as we came up to the track.

"Q. Whereabouts did you look? A. We sat in the seat.

"Q. How far from the track were you? A. I guess thirty or forty yards.

"Q. You looked for the train when you were thirty or forty yards back from the crossing? A. Yes, sir.

"Q. When you were thirty or forty yards back from the crossing you looked both ways for the train? A. Yes, sir.

"Q. And, then, as the team was going up onto the crossing you looked again and you saw it about thirty yards or so, south of the crossing? A. Yes, sir.

"Q. I show you a picture marked No. 4.

"Mr. Cannopa, with the heads of the team right at the crossing; does that correctly represent about where the team and this train was when you saw it? A. Yes, sir; it was about there with the heads of the team on the other rail."

He further testified that Mr. Sanguinette was smoking; that he thought the train had gone north; that he had often gone over that crossing, sometimes as often as four times a day, and knew of the road-crossing ever since it had been located there. On re-direct examination, by plaintiff's counsel, witness was asked what prevented him from seeing the train. He answered, that there were some horse weeds near the track that obstructed his view.

Moses Aubuchon testified that on the 16th day of August, 1902, he was seven or eight hundred yards south of Genevieve station, wanted to make that station to take the afternoon train north, but that he did not have the time; he believed he was too late, until he heard the train whistle at the long cut some half a mile or mile away south, and when he heard it he made an effort to get to the depot as he wished to get on the train; that it passed him four or five hundred yards south of the station and was running fast; he heard no whistle or bell; that his hearing was good; he saw the train hit something; he had run four or five hundred yards and was tired and sat down to rest. That he heard them ring the bell when they started off again, while he was still sitting down resting; that he was at the same place from which he saw them strike something. That he then went up there, "found a wagon crushed up, one person dead and another almost dead and another crippled." "It was right on the Madison crossing."

Charles M. Taylor testified that he saw the accident; at the time he was on a wagon in front of Judge Madison's house. "I heard a noise and it was only a second until it struck." He noticed the parties on the

wagon, they were strangers to him.  They were in a common farm wagon, driving in a very slow walk, going east; after they passed him about one hundred and fifty yards from the crossing, he was facing and looking in that direction.  ''I only heard a whistle and a crash at the same time.  Q.  Were you looking at them at the time?  A.  Yes, sir, I was.''  That he did not hear a bell, that his hearing was good and if the bell had been ringing he would have heard it.  The road from Judge Madison's house is a smooth road to the crossing, and at that time was dry and smooth.  The wagon did not make a noise to prevent people from hearing.  ''Q. Did you hear the rumbling of the train?  A.  I heard a noise and just as I heard the noise I heard a crash. Q.  Are you familiar with that crossing?  A.  Yes, sir.  Q.  State to the jury the condition of the right of way there?  A.  If you go from Mr. Madison's house, on this side, there are some very high horse weeds there, I think they are about twelve feet high.  Q. Did you ever go through there on a wagon?  A. Yes, sir.  Q.  What effect did it have on your view looking down the road?  A.  You could not see until you got on the road.  I jumped off the wagon and run down that way, a couple of the other boys followed me; I saw one man lying under the wagon, one hanging on the cattleguard, on the other side the young fellow was across the dump, lying there with his jumper over his head, I turned him over, he was still breathing, it made me sick and I left him.  I saw only one horse, it was knocked through the fence.  The train ran beyond the station about three hundred yards before it stopped; the train was running forty or fifty miles an hour.''

Joseph Bradford testified:  Lived three miles from DeSoto; was at Genevieve station on date of accident, was at Judge Madison's house at the time, had just taken his grip out, and was standing by the wagon; did not see the parties before collision.  ''Q.  What was the first thing you saw?  A.  I heard a noise as I

was standing by the wagon and I looked down and saw the pieces going in the air. Q. Pieces of what? A. It was dust it looked to me like. Q. Where were they? A. Right on the crossing.'' That was the first noise of a train that he heard and that there was nothing to keep him from hearing, that his hearing was good; after the accident he went down there; saw the wagon and one man under the rubbish, one man hanging over the cattle-guard dead, and got over inside and there found the young man; he did not know the parties. He heard neither bell nor whistle and there was nothing to have prevented his hearing them.

John N. Conn testified that he was at the scene of accident soon after it happened. ''I found Wiley Cannopa, bleeding and injured; Henry Sanguinette was hanging over the cattle-guard and Jim was lying on the right of way about twenty-five yards from the cattle-guard. Henry Sanguinette was dead. Q. State to the jury if there was anything on the right of way to obstruct your view as you came from the west side? A. Yes, sir, on the south side of the road (county road) inside of the cattle-guard there was a lot of horse weeds. Q. Tell the jury what the character of that growth of weeds was? A. They were pretty high weeds, I suppose they would obstruct the road from view. Q. Could you from the point of view on the public road that you were in see down the right of way through those weeds? A. No, sir, not from the road I could not. Q. How high were those horse weeds? A. Ten or twelve feet. Q. Did you measure them? A. Yes, sir. Q. How high were they? A. Twelve feet. Q. How high were they in regard to the balance of the horse weeds there? A. About an average.'' One of the horses was lying on the far side of the track, inside of the right of way, forty or fifty yards from the crossing.

On cross-examination this witness was asked:

"Q.   After a party in the wagon passed the highest weeds, was there anything to prevent him looking down the track?   A.   No, sir, he would have to get on the track before he could see down.   Q.   If he was on foot?   A.   No, sir.   Q.   Did you ever try that in a wagon?  A.   No, sir, I have tried it in a buggy."

R. G. Madison testified that he lived near Genevieve station on defendant's railroad; that he was sitting on his porch at his house when deceased and party passed in the wagon; that he had lived there thirty years.   "Q.   What first attracted your attention to the accident?   A.   The first thing, I was in conversation with one of the linemen or telephone men, they had their grips at my house and were putting them on the wagon; I heard a little toot and then a crash, all at once; I thought it was a crash of a board or something unusual.   There was just a little whistle like that (illustrating).   There was one of the boys, I believe, who said they had run through the fence; I was on my feet and when I got there Mr. Taylor, or some one, said they had killed the men that had just passed down the road in the wagon.   Q.   Did you see the train?   A.   After it had struck.   Q.   How was it running?   A.   It seemed to be running just as fast as steam could drive it. When I got there I saw Henry Sanguinette dead and his boy dying, and I thought Wiley Cannopa was dying too.   I went to see where they had stopped, to see if I could find out something more.   It run about three hundred yards, because I stepped it.   One of the horses was knocked about sixty-five feet from the crossing over on the east side of the right of way, the other horse was about three hundred yards up the track.   It is down-hill from my house to the railroad, I would say about two hundred yards, I think.   In going down the road you get about half way down the road from the house and you could see the railroad track, and you could see it until you come to a little log house on the right-hand side going south, and after you get there

there is a kind of a sag and rise again, and when you get there you cannot see it. Q. What would prevent you seeing after you passed the little log house? A. The high weeds there. Q. What kind of weeds were they and what kind of obstruction did they make? A. They were horse weeds, and I suppose would cover a space of forty feet wide, that one side of the right of way of the railroad and probably thirty yards along. Q. About how high do you think they were? A. About ten feet high; I had some boys in there after my hogs and they could not see them two feet ahead of them. Q. They would be between a man and the railroad coming from the south? A. Yes, sir; it would obstruct the view entirely. Q. How would they compare with the height of a man on a spring seat? A. Would consider a man on a spring seat would be about six feet from the ground and I don't think he could see over the tops of the weeds; I have tried it on horseback and could not see over them; I did that after they had taken these photographs to satisfy my own mind, I saw them there taking them." On cross-examination he said, that from a point opposite to the little house to the right of the county road he could see a train down the road one hundred and fifty yards from the crossing; that the little house was some forty yards from the crossing. That he did not hear the train whistle, "but I have heard them whistle tremendously loud almost every day since that." That train only whistled that little short toot. "Q. From a point opposite the little house, how far could you see a train at that time? A. One hundred and fifty yards, maybe. Q. After you passed that view you got onto the track before you could see it? A. Yes, sir."

Defendant offered the following testimony:

David B. Hyer testified that he was a civil engineer and measured various distances in the neighborhood of the crossing; that he measured the weeds shown on photograph No. 4, and that they were ten feet high

from the roots to the top; that the difference in the elevation between the ground at the roots of the high weeds and the little sag in the county road was about two feet; or, in other words, that the ground where the weeds were the highest was two feet and six inches lower than the road; that it was seven feet and six inches from the ground in the county road to a point on a level with a man's eye sitting in a wagon. These measurements were taken on the 24th day of September, and that the weeds at that time were about one foot higher than they were in August; that at that date some experiments were made by the use of a train on the track and driving a mule team on the county road; three parties were seated in the wagon, Mr. Malugen, Mr. Bowman and Mr. Fake; that the space covered by what was called the highest weeds was about ten feet; that when the party was in the wagon on the west side of the high weeds and fifty feet from the railroad track, he could see four hundred and twenty feet south of the crossing on the railroad track, and referring to weeds shown in photograph No. 4, witness stated that after he had passed the high weeds and was on his way to the crossing and twenty-five feet from it he could see the engine two hundred to six hundred feet south of the crossing.

Charles H. Fake testified that he was a civil engineer; that on the occasion when the photograph was taken a train was run up and down the track, and stopped at certain places. Witness testified that from a point thirty or thirty-five feet west of the crossing a train can be seen by a party in a wagon a quarter of a mile south on the track, and from that on until it reached the crossing; that he looked on the east and west side of the high weeds five or six feet, and that after you had passed the high weeds there was a space of from thirty-five to forty feet before the track was reached, from which point a train could be seen a quar-

ter of a mile; that the party in the wagon could also hear the train if he listened.

Francis Haynes testified that he was engineer of the train which struck the team; train consisted of an engine, tender and two cars, one a combination mail, baggage and passenger car, and the rear car a passenger car. The train was equipped with Westinghouse air-brake and the train machinery in good working order; that the air-brakes were also in good condition; that about fourteen hundred feet south of Genevieve crossing he sounded the whistle signal for the crossing, giving two long and two short blasts; that the fireman also rang the bell; that when the engine was about thirty feet from the crossing he saw the heads of the team driving onto the crossing; that he immediately set the air-brakes and sounded an alarm, but that it was too late to avoid striking the team; as the engine struck the team he (the witness) was struck by something flying in the air, which caused him to release his hold on the air-brake, which released the brake, and the train ran some distance further up the track; that he could not see any more of the team than the horses' heads, as he could not look around the front of the engine; that the engine hit the horses about the center of the body of the horse next to the engine. Witness did not see the wagon at all; that the horse was carried on the pilot three hundred and eight feet until the train stopped and was then taken off the front of the engine.

Charles Cubberly testified that he was manager of a construction and grading company of St. Louis, and was a passenger on the train; that before the train reached the crossing he heard the alarm given for the crossing, one long and two short blasts, and heard one long whistle for the station.

John Hahn testified that he was the fireman and heard the engineer give two long blasts and two short blasts of the whistle for the Genevieve crossing and that he (the fireman) rang the engine bell and continued

to ring it until the train stopped; that as the train was coming up the track witness saw the wagon and team, when the horses heads were about twenty or twenty-five feet from the track; that is, from the west rail. Witness jumped to his feet and hollowed and the engineer set the brakes; that there was no way to avoid striking the team at that time; that the engine struck the team and one of the horses was carried on the pilot of the engine about seven hundred feet north of the crossing.

Mary Brennen testified that she was a passenger on the train and heard an alarm given by two short and one long blast of the whistle before the train got to the crossing; when she heard the whistle she looked out to see what place it was; the train ran some little distance after she heard the whistle and struck something; she testified that she also heard the bell ringing.

Miss Ellen Brennen testified that she was also a passenger on the train, going with her mother to St. Louis; that she heard the whistle blow and the bell ring; after she heard the signal of the whistle and the ringing of the bell the train ran some distance before a collision occurred.

Fred Stredfus testified that he was a passenger on the train; he heard a whistle and also heard the bell ringing—heard two long and two short blasts of the whistle, and then the bell commenced to ring; thought it was six or seven hundred feet from the crossing at Genevieve station.

Leo Lett testified that he was also a passenger on the train and heard the whistle; that when he heard the whistle he looked out of the window and another man asked him what station it was. At that time he was about three hundred yards from the station.

Mary Hine testified that she lived about a quarter of a mile west of the railroad; about 6:20 she heard the train whistle, and it was going north toward Riverside, and she also heard another whistle about the cross-

ing; noted the time because she was waiting for her son who was at the station and had not returned for supper. When she heard the whistle, looked out and saw that it was the passenger train going north.

Truman Bellknapp, who was the conductor of the train, testified that he heard the whistle blown for the crossing, two long and two short blasts; also heard a further whistle for the station; that the whistle for the crossing was sounded about fourteen hundred feet south of the crossing; he also heard a couple of toots of the whistle near the trestle, south of the crossing, and supposed someone had flagged the train; felt a jar; also heard the bell ringing; train did not stop until after it had struck the horses.

William McCally was plowing in the field east of the railroad, and was about a quarter of a mile south of the crossing in the field; saw the train pass that evening and heard the whistle for the station about two hundred and fifty yards south of the crossing; thinks he heard three or four whistles.

John Bowman testified that he was an engineer; was one of the parties who assisted in making the experiments with the running train and sat on the seat of the wagon; that after the party in the wagon had passed the high weeds, and when forty feet from the track, he could see down the track probably a quarter of a mile.

J. S. Dutton, liveryman from DeSoto, Missouri, testified that on the day when the wagon was used for the purpose of making experiments, he got in the wagon and rode down to the crossing; that there was a space of from four to six feet covered by the weeds; that you could not see the railroad, and that after driving past the high weeds a train could be seen coming north three or four hundred yards south of the crossing by looking for it; that he looked while sitting in the wagon and did see the train; that this was when the heads of the team would be ten or twelve feet from the track.

Mr. Bowman, being recalled, testified that a train running thirty or thirty-two miles an hour with the ordinary air-brakes in good condition, the train under perfect control could be stopped in about four hundred feet.

William Babb testified that he was the brakeman on the train, and that he heard the regular whistle signals, two long blasts and two short blasts, thirteen or fourteen hundred feet south of the crossing.

Henry Hine testified that it was his duty to attend Genevieve station for the purpose of flagging trains in case persons desired to get on at that station; that he was at the station and heard the train coming; that he heard it give one long whistle and three short ones below the crossing; he heard another whistle about the time he saw the people driving on the crossing; that they drove on the crossing when the engine was between the cattle-guard and the trestle south of the crossing; that he first heard the whistle of the train down at Hughes, which is about a quarter of a mile south of the station.

Mr. Cannopa was recalled on the part of the plaintiff, and was asked how far he was from the railroad track when he saw the train, and answered: "The horses were right on the track; as the horses were going over the front rail I saw the train about thirty yards away."

On cross-examination he said: "Q. You said yesterday in your examination in chief that the train was about the little trestle when you saw it? A. Yes, sir. Q. You said the horses were just going up, with their heads over the track? A. Yes, sir. Q. The horses were not on the track? A. They were right over the first rail."

R. G. Madison was recalled and testified that it was about eight or nine hundred yards from the crossing down to Hughes.

John N. Conn testified to a conversation had by him with witness Henry Hines.

At the close of plaintiff's evidence and again at the close of all the evidence, the defendant asked for an instruction in the nature of a demurrer to the evidence, which instruction the court refused to give, and to which action of the court in refusing to give said instruction defendant saved its exceptions at the time.

Upon the evidence and instructions, the jury returned a verdict for plaintiff, and defendant duly filed its motion for a new trial, alleging that the verdict was contrary to the evidence; that under all of the evidence the verdict should have been for the defendant, and that the court erred in overruling defendant's demurrer to the evidence. Defendant also filed its motion in arrest of judgment, which motions being overruled, defendant duly saved its exceptions and brought the case to this court by appeal, and now assigns as error the action of the court in refusing to give the instructions demanding nonsuit, and also that the court erred in admitting certain testimony on part of plaintiff. Defendant further insists that the verdict is so contrary to the weight of the evidence as to indicate passion and prejudice on the part of the jury.

At the threshold of this case we are met with the contention that this appeal ought to be dismissed because, as contended, the defendant has failed to comply with rules 11 and 13 of this court, in that it has not filed with this court an abstract of the record setting forth so much of the record as is necessary to a full and complete understanding of the questions presented for decision; and further, that defendant did not serve respondent with a copy of the abstract of the record thirty days before the cause was set for hearing.

This case was brought here upon an abstract of the record, and in such case rule 11 of this court provides that the appellant shall file in this court a copy of the judgment, order or decree, in lieu of a complete

transcript, and shall deliver to respondent a copy of his abstract at least thirty days before the cause is set for hearing. It also provides that "if the respondent is not satisfied with such abstract, he shall deliver to the appellant a complete or additional abstract at least fifteen days before the cause is set for hearing, and in like time file ten copies thereof with the clerk of this court." Rule 13 provides that the abstract mentioned in rules 11 and 12 shall set forth so much of the record as is necessary to a full and complete understanding of all the questions presented to the court for decision. Appellant in due time filed in this court a copy of the judgment in lieu of a complete transcript, in accordance with the provisions of section 813, Revised Statutes 1899. The cause was set for hearing January 8, 1906, and the abstract of appellant was served upon respondent October 14, 1905, more than thirty days before the cause was set for hearing. Respondent did not, however, deliver to the appellant a complete or additional abstract at least fifteen days before the cause was set for hearing, as rule 11 provides she should do if not satisfied with said abstract; nor did respondent file a motion to dismiss the appeal or to strike the cause from the docket on the ground of the alleged failure of appellant to comply with said rule.

While the abstract does not set forth in regular order everything which was matter of record as distinguished from matter of exception, yet, when taken altogether, it does set forth as much of the record as is necessary to a full and complete understanding of all the questions presented to this court for decision, the only objection being that it does not clearly separate the record entries from matters that should be incorporated in the bill of exceptions. We have found no trouble, however, in making the distinction. The abstract contains a copy of the pleadings, instructions and verdict, also of the several orders of continuances and of the motion for a new trial; a copy of the order

overruling the motions for new trial and in arrest of
judgment, and of the order allowing the appeal and
granting time in which to file bill of exceptions; also
certificate by the clerk that the bill of exceptions was
filed on July 22, 1903, and that the bill was so indorsed
upon that day. The abstract also shows that a duly-cer-
tified copy of the judgment and order granting appeal
to this court was properly filed. The objection to the
abstract is, therefore, purely technical; and as it does
not appear that the respondent was dissatisfied with it,
or that she delivered to appellant a complete or addi-
tional abstract, as provided by rule 11, and did not file
a motion to dismiss the appeal or to strike the cause
from the docket, but argued the case upon its merits in
a brief filed, respondent must be held to have waived
any objection to said abstract. But in any event, we
hold the abstract to be a substantial compliance with the
rules of this court and that the case should not be dis-
missed or stricken from the docket on account of the ob-
jections taken, especially as no motion was filed for
such purpose. [State v. Miller, 189 Mo. 676.]

Defendant contends that the evidence shows such a
clear case of contributory negligence upon the part of
Henry Sanguinette, deceased, and his son, the driver of
the wagon at the time of the accident, that the judg-
ment should be reversed without remanding the cause.
That these parties were perfectly familiar with the
crossing, and had traveled over it on divers occasions,
is too clear for argument. The evidence also conclu-
sively shows that a grown person riding in a wagon
similar to that used by deceased could, when within
twenty-five or fifty feet of the crossing on the west side,
see a train approaching from the south when at a dis-
tance of from two hundred to four hundred and fifty
feet south of such crossing. Notwithstanding these
facts, plaintiff's husband neither stopped, looked nor
listened for an approaching train, but in utter disre-
gard of his safety, drove heedlessly onto the railroad

track, and as a consequence of such heedlessness and carelessness was struck and killed by defendant's train, without any proved negligence upon the part of those in charge of such train, for the evidence was altogether conflicting with respect to the alleged failure of defendant's servants to sound the whistle or ring the bell as the train approached said crossing. In 3 Elliott on Railroads, section 1165, it is said: ''As a railroad track is a warning of danger, one who attempts to cross it must act with care proportionate to the danger and not suffer his attention to be diverted from the danger before him, and he must keep his faculties in active exercise. It is his duty to keep his faculties in condition for exercise and to exercise them. Mental absorption or reverie will not excuse the traveler who omits to perform the duty of looking and listening. If the traveler could have seen the train by looking, the presumption is that he did not look, or if he did look did not heed what he saw. This presumption, in conjunction with the fact that the courts judicially know that great throngs of persons daily cross railroad tracks without receiving injury, renders necessary and logical the conclusion that prima facie an accident at a crossing is attributable to the negligence of the traveler. A traveler who knows that a train is due must take care to avoid it, and this knowledge imposes upon him a somewhat higher exercise of care than if he was not in possession of such knowledge. Principle requires that in such a case a person who attempts to cross the track should be held guilty of negligence as matter of law if there are obstructions to sight or hearing, since no one can be said to exercise ordinary care who voluntarily encounters a danger that he knows is imminent, unless the situation and conditions are such as to enable him to see that he can proceed with safety. Analogous cases emphatically affirm that one who assumes to proceed upon a calculation of chances is guilty of negligence, and the

rule established by those cases applies to such cases as we have mentioned.''

Hayden v. Railroad, 124 Mo. 566, was an action for damages for the death of plaintiff's husband who was struck and killed by one of defendant's passenger trains on a public road-crossing. The petition charged that his death was caused by the negligence of the defendant in allowing prairie grass and weeds to grow upon its right of way and near said crossing, so as to obstruct the view of its tracks, and in failing to sound the whistle or ring the bell on the approach of its train to said crossing, as required by law. The answer was a general denial and the plea of contributory negligence. The evidence showed that the servants of the railroad in charge of the train were negligent in failing to give signals, but that, nevertheless, the deceased could have seen the train by looking. Hayden was driving a two-horse team to a wagon, and could have seen the approaching train when he was from fifteen to thirty feet from the crossing. At the close of all the evidence the court sustained a demurrer thereto, and plaintiff appealed. BRACE, J., in speaking for the court, said: ''The engine must have struck about the front wheels of the wagon, as the deceased was almost instantly killed, and the body cast to the south side of the road. He must have been traveling about three or three and a half miles an hour. The train was traveling ten times as fast, so that when his eyes were fifteen, twenty, twenty-five or thirty feet south of the track, as the case may have been, the train must have been within a distance of one hundred and fifty to three hundred feet of the crossing. Could he then, by turning his eyes in that direction, have seen the train? The spring seat upon which he was sitting was from five and a half to six feet from the ground; his eyes must have been at least two feet higher; the surface of the high grass which then intervened between him and the train was seven feet. The train was either on a level or near it

on the descending grade of the track, which could not. have been appreciably greater than the descending grade of the surface of the grass, towards the drain over which the track passed. So that, his eyes being above the plane of the grass, all the upper part of the train down to within at least seven feet of the track must have been plainly within his view, and as the height of a train of passenger cars is about fourteen feet, it is safe to say that at least one side of the upper half of the whole train must have been within his view. It will thus be seen that it was a physical impossibility for the deceased to have failed to see the approaching train, if he had looked in that direction, as it was his duty to do, while yet in a place of safety, and before entering upon the line of danger. Had he done so, there can be no question that he could, and would, have stopped his team until the train passed, and then crossed over in safety. But for some unexplained reason he failed to do so. And thus it is, though the defendant may have been negligent in failing to give the signal for the crossing, and in permitting the high grass to be upon its right of way, yet the deceased having lost his life through his own negligence in failing to discharge the duty imposed upon him by law, in his situation, the plaintiff cannot recover for his death. This conclusion we find to be irresistible after a very careful examination of all the evidence, in the consideration of which every reasonable inference in favor of the plaintiff has been made. Consequently we cannot find that the trial court erred in sustaining the demurrer to the evidence, and in refusing to set aside the nonsuit."

It appears from the evidence that after the wagon in which deceased was riding had passed the high weeds there was an open space of more than thirty-five feet to the railroad track. It further appears that the wagon was not stopped, nor was there any evidence that any of those riding therein, except Cannopa, look-

ed or listened for an approaching train.    He testified that when they got near the railroad he looked for a train, but saw none, and that they were right on the crossing when they discovered it.

In Huggart v. Railroad, 134 Mo. 673, GANTT, P. J., speaking for the court, said: ''It is an uncontradicted and conceded fact that when he reached a point from thirty to forty feet from the track, a point where he was free from all danger of collision with trains upon the road, he could have seen up the track to the west a distance of six hundred and possibly a thousand feet. As a physical fact that train was then in sight.   One of two conclusions is inevitable: he either did not look and heedlessly rode upon the track and was killed, or he looked and saw the approaching train and attempted to cross ahead of it.   In either case he was guilty of such contributory negligence as bars a recovery by his widow.   Porter Huggart is dead.   We have no explanation of his conduct in attempting to cross the track in the face of a rapidly approaching train, but in view of the physical impossibility of his failing to see the train, had he looked to the west, as it was his clear duty to have done, while yet out of danger, the law denominates his conduct in going upon the track and attempting to cross as contributory negligence.   There can be no presumption of ordinary care in the face of such facts to the contrary and without explanation.    [Hayden v. Railroad, 124 Mo. 566; Kelsay v. Railroad, 129 Mo. 362; Lane v. Railroad, 132 Mo. 4.]   The learned counsel for plaintiff, while conceding the force of these cases as precedents, yet attempts to draw a distinction between those cases and the one at bar because he thinks plaintiff's husband was not in a place of safety when thirty to thirty-five feet from the track when he first saw the train; that he could not stop his team; that he was a stranger and driving a borrowed team. Neither of these circumstances, nor all of them combined change the complexion of the deceased's conduct. There is not

a particle of evidence that the team was unmanageable or that the deceased was ignorant of their characteristics. The fact that he had never crossed at this point prior to this occasion, instead of lessening his care, should have incited him to greater vigilance. That a man of mature years, in possession of his mental and physical faculties, driving a team to an ordinary farm wagon, up grade, at an ordinary gait, and seeing a train approaching while yet thirty or forty feet from a railroad crossing could not safely stop without going upon the track, is contrary to reason and common experience. In our opinion the facts bring the case clearly within the rule announced in Hayden v. Railroad, supra, and the court should have sustained the demurrer to the evidence."

In this connection, we may appropriately refer to said photograph, which was identified by witness Cannopa while testifying, and which shows the wagon a few feet only west of the track. This witness testified that he looked both ways for a train when they were thirty or forty yards back from the crossing, and looked again as the team was going up on the crossing, and saw the train thirty yards or so south of the crossing, that the photograph in evidence represented about where the team and the train were when he saw the train; that "it was about there, with the heads of the team right on the other rail." What Cannopa saw, the driver, James Sanguinette, and deceased, Henry Sanguinette, could have seen had they looked. Cannopa testified on re-direct examination:

"Q. What did you do; you say that place is thirty yards wide? A. I kept looking until I saw the train.

"Q. You looked for it about thirty yards away and continued to look? A. Yes, sir.

"Q. What do you mean by thirty yards; is that the space back from the track? A. Yes, sir.

"Q. How near did the horse weeds come up to the

track that obstructed your view? A. Right up to the cattle-guard.''

This testimony is completely answered by the photograph in evidence, as well also by the case of Payne v. Railroad, 136 Mo. 580, wherein is quoted with approval, from Artz v. Railroad, 34 Iowa 153, the following:

''But is urged by the appellee's counsel that the plaintiff testifies that he did both look and listen to see and hear the train, but did not; and that this testimony shows that he was not guilty of contributory negligence, or, at the very least, it made that a question of fact for the jury. The difficulty, however, with the position is that, the conceded or undisputed facts being true, this testimony cannot, in the very nature of things, be also true. It constitutes, therefore, no conflict. Suppose the fact is conceded that the sun was shining bright and clear at a specified time, and a witness, having good eyes, should testify that at the time he looked and did not see it shine, could this testimony be true? The witness may have been told that it was necessary to prove in the case that he did look and did not see the sun shine; he may have thought of it with a desire that it should have been so; he may have made himself first believe it was so, and this belief may have ripened into a conviction of its verity, and, possibly, he even may testify to it in the self-consciousness of integrity. But, after all, in the very nature of things, it cannot be true, and hence cannot, in the law, form any basis for a conflict upon which to rest a verdict. A man may possibly think he sees an object, which has no existence in fact, but which it may be difficult, if not impossible, to prove did not exist or was not seen. But an object and power of sight being conceded, the one may not negative the other. In this case the plaintiff had good eyes; the train was approaching him in the night, with the engine's headlight burning brightly; if the plaintiff looked he must have seen the headlight, or he

must have looked very negligently and carelessly — in either case he was necessarily, in the eyes of the law, guilty of contributory negligence, precluding his right to recover." [See, also, Hook v. Railroad, 162 Mo. 584; Fletcher v. Railroad, 64 Mo. 484; Lane v. Railroad, 132 Mo. 16; Jones v. Railroad, 63 Mo. App. 508; Lien v. Railroad, 79 Mo. App. 478.]

It is, however, earnestly insisted by plaintiff that when a party crossing a railroad track cannot see an approaching train because the view is obstructed, and there is nothing to prevent his hearing a train, he is not as a matter of law required to stop before going upon the track, and that whether, under such circumstances, the party complaining would be guilty of negligence would ordinarily be a question for the jury. The evidence in this case, however, shows that when the wagon was about to go upon the railroad track, and in a place of safety, Cannopa saw the train that struck and killed Sanguinette and his son, ninety or more feet south of the crossing. They had the same opportunity for seeing that Cannopa had, and could have seen if they had only looked. "If a traveler, by looking, could have seen an approaching train in time to escape, it will be presumed, in case he is injured by collision, either that he did not look, or, if he did look, that he did not see what he said. Such conduct is held negligence." [Beach on Contributory Negligence (2 Ed.), sec. 182; Wharton on Negligence (2 Ed.), sec. 382.]

The train was a passenger train. The engineer did not see the team until the heads of the horses were about even with the west rail, and he could not have seen them before then, nor have avoided striking them. The occupants of the wagon, however, could have seen the train had they been looking after they had passed the high weeds, and in a place of safety, when the train was from two hundred feet to a quarter of a mile south of the crossing.

In Schmidt v. Railroad, 191 Mo. 215, plaintiff was

in the act of crossing defendant's tracks when he was struck by one of defendant's passenger trains and killed. When he reached a point twenty feet south of where the collision occurred, he could, by looking west, the direction from which the train was coming, have seen it at least two hundred and fifty feet away, and it was insisted by respondent, in support of the judgment in that case, that the presumption should be indulged that Schmidt looked and listened before going upon the track. GANTT, J., speaking for the court, said: "To indulge the presumption in this case that Mr. Schmidt used due care and looked west for the approaching train before stepping on the main track, would be a contradiction of the plaintiff's evidence that he was a man of good eyesight. If he had looked west he could not have failed, while he was yet in a place of safety, to have seen the approaching train, and had he done so there can be no question, as he was shown to have been a man of bright mind, that he would have stopped and permitted the train to have passed him and then crossed over in safety. The very fact that he did step upon the track immediately in front of the approaching engine and was struck instantly is an absolute demonstration that he did not look, or if he did, that he was bent upon suicide. The presumption indulged by the learned counsel in behalf of plaintiff is, we think, in this case, negatived by all the evidence in the case. On the other hand, it is proper to consider the duty of the engineer in charge of the defendant's train. It is undeniable that when he was yet one hundred and seventy-five or one hundred and eighty feet distant from the crossing on which plaintiff's husband was killed, he saw the deceased fifteen or eighteen feet from the track, and it was then that he began to give the danger signals, because he saw that the deceased was walking toward the tracks. The engineer testified that he thought he would stop when he whistled at him, and he did not change his

opinion until he was nearly on him, when he discovered that he was about to attempt to pass in front of him. In Guyer v. Railroad, 174 Mo. l. c. 350, it was said by this court: 'Suppose the engineer saw him, what did he have the right to presume? It was broad daylight, the engine coming was in as plain view to the man on the roller as he was to the engineer. There was nothing to suggest to the engineer that the other was oblivious to the situation, or that he had failed to use his eyes and see what every one else there saw. Any reasonable man in the engineer's position would presume that the man on the roller would stop before crossing and let the engine pass. . . . Even though he saw the driver of the team approaching dangerously near the crossing, yet he had a right to presume that the driver had used his eyes and would act as a reasonable man under the circumstances would for his own preservation. If the team had been approaching rapidly, there might have been in that fact some suggestion that the driver intended to try to cross in front of the engine. But approaching, as he was, at a very slow pace, there was nothing to indicate that he would not or that he could not stop before going on the main track.' And it was ruled in that case that the demurrer should have been sustained."

In the recent case of Green v. Railroad, 192 Mo. l. c. 143, VALLIANT, J., speaking for the court, says: "If the only evidence in this case was proof of the accident and proof that the bell was not rung, there would have been, according to the terms of the statute, a prima facie case, leaving the burden of proving facts to show non-liability on the defendant. But where the plaintiff in proving the accident proves also that it was not caused by the failure to give the signal, or that the person injured was guilty of negligence that directly contributed to the result, there is left nothing for the defendant to prove."

The facts disclosed by the record in this case show conclusively that Henry Sanguinette, plaintiff's husband, was at the time of the unfortunate occurrence guilty of such gross negligence, contributing to his death, as to preclude her recovery. Upon this question there is no room for reasonable minds to differ.

Our conclusion, therefore, is that the demurrer to the evidence interposed by the defendant should have been sustained by the court, and a peremptory instruction given the jury to find for the defendant.

The judgment should be reversed. It is so ordered. All concur.