GEORGE B. FLACK, Respondent, v. METROPOLI-
TAN STREET RAILWAY COMPANY, Appel-
lant.

**Kansas City Court of Appeals, March 4, 1912.**

**NEGLIGENCE: Humanitarian Doctrine: Street Railways.** Plaintiff
sued for damages for injuries received when his electric coupe
collided with an electric street car, while crossing the tracks
at a street intersection. *Held*, that the evidence of plaintiff
presents an issue of negligence on the part of the motorman
in the performance of a humanitarian duty he owed plaintiff and
the jury were entitled to believe that the motorman had ample
opportunity to avoid the injury but recklessly disregarded it and
negligently ran into plaintiff.

Appeal from Jackson Circuit Court. —*Hon. James E.
Goodrich,* Judge.

AFFIRMED.

*John H. Lucas* and *H. W. McCluer* for appel-
lant.

*C. A. Lawler* and *E. R. Morrison* for respond-
ent.

JOHNSON, J.—This is an action for damages
for personal injuries plaintiff alleges were caused by
negligence of defendant. The verdict of the jury was
for plaintiff in the sum of $11,083.33. A remittitur of
$3583.33 was entered and judgment rendered for the
remainder. Defendant appealed.

The injury occurred in the afternoon of March 14,
1909, and was caused by a collision between an electric
coupe and an electric street car operated by defendant
on Broadway street in Kansas City. This street runs
north and south and is sixty feet wide between the
curbs. Defendant operates a double track railway in

the middle of the street. Each of the tracks is four feet seven inches wide, the distance between them is five feet four inches and, therefore, the width of the space occupied by both tracks is fourteen feet six inches. The width of the pavement on each side of the tracks is twenty-two feet, nine inches. Thirty-eighth street runs east and west and makes a jog of two two hundred feet at the interesection of Broadway. The street east of the intersection it about two hundred feet north of the street west of the break. Plaintiff, who was the only occupant of the coupe, was east-bound on Thirty-eighth street and when he reach the west line of Broadway it was his intention to cross over to the east side of that street and go north to the east continuation of Thirty-eighth street and thence east on that thoroughfare, but on account of passing street cars he changed his course by turning north on the west side of Broadway and running about twenty-five feet in that direction. Then he turned eastward to cross the tracks, took a course north of east and had almost cleared the crossing of the west railway track when a south-bound street car on that track, running at high speed, struck the rear wheel of his coupe and caused the injuries of which he complains. In approaching Broadway from the west plaintiff was running eight or ten miles per hour but he reduced speed before entering Broadway and ran slowly over the crossing. We quote from his testimony:

"Q. State, if you remember, what speed you were going at as you approached Broadway on West Thirty-eighth? A. Probably eight or ten miles an hour.

"Q. And until what time did you maintain that speed? A. Until I got almost into Broadway, I slowed down then.

"Q. Then what did you do after that? A. Well, a south-bound car passed me just there, I turned to-

wards the north, slowing up, and then there was a north-bound car right there which I hit nearly, angling a little to the east.

"Q. Then from that time on what did you do? bound car, a car that afterwards struck you? A. Just before I turned there I looked up the sreet, and away up the street there three or four hundred feet I saw a car.

"Q. Was that the same car that afterwards ran into your machine? A. I presume it was.

Q. Then from that time on what did you do? That is, after getting to Broadway what did you do then? A. I angled up towards the north, I went north angling a little to the east. I looked up the track a matter of a hundred feet or so, and didn't see a car. I turned almost due east with the idea of going across the track.

"Q. Then what occurred after that? A. When I got just up about to the street car track, I looked to the right and I saw this automobile going by.

"Q. That is the one Miss Ransom was in? A. Yes, sir.

"Q. Then what occurred? A. Then I slowed down there, well, just dragged across waiting for them to get out of the road.

"Q. Where was your electric automobile when it was struck by the street car? A. I had got almost over it, over the track, somewhere just north of the north line of West Thirty-eighth.

"Q. That is you were nearly, somewhere near the north line of West Thirty-eight street? A. Yes, sir.

"Q. And your automobile had almost gotten off of the track when it was struck by the street car? A. Yes, sir.

"Q. What part of the automobile was struck by the street car? A. The left hind wheel.

"Q. Well, did you see the car, that street car before it hit you? A. Well, after I slowed up.

"Q. I mean just before it hit you? A. Just as that automobile went by I heard the clang of a bell. I looked up. There was a street car, he was a matter of ten or twelve feet away from me. I put on my power with an effort to get over if I possibly could, but before I could get off the track the car hit me."

*On cross examination he testified*:

"Q. Now, you first turned north after getting to Broadway, did you? A. Yes, sir. Q. How far did you go north, or in a northerly direction? A. I imagine about twenty-five to thirty feet. Q. Then did you turn in an easterly direction? A. At the time I looked up the track to see the car and turned to cross it." . . .

"Q. When did you come to the conclusion that you crossed the street, or started to cross the street, twenty-five feet or so north of Thirty-eight street west? A. Well, as I got into Broadway there was a north-bound car there prevented me from going straight across, I just slowed around to the north, let it go by; as soon it went by I was ready to go over.

"Q. Did you discover a south-bound car there too? A. Just before I got to the street there was a south-bound car went down.

"Q. That would be a car two blocks ahead of the one that hit you? A. It was fully a block ahead.

Q. Now, didn't you go clear up on the west side of the street until you got up opposite to East Thirty-eighth street and then cross over? A. No, sir." . .

"Q. Now, when you were coming into Broadway did you notice an automobile there then, any automobile there anywhere? A. No, sir.

"Q. When did you first notice the automobile? Where were you when you first noticed the automobile? A. Well, when I was almost in the track crossing it.

"Q. And where was that automobile at that time? A. Just a little bit to the south of me, going north.

"Q. That is a wide street there, isn't it? A. Yes, sir." . . .

* * * * *

"Q. How was this automobile going as to speed when you first saw it? A. I don't know how it was. It struck me that when I first noticed it, that it had checked practically, and as I slowed it up he sped up.

"Q. And after you first saw it was it in that space between the south-bound track and the curb? A. It was between the north-bound track and the curb.

"Q. Between the north-bound track and the curb? A. Yes, sir.

"Q. And was it about the middle way of that space? A. I could not tell you that.

"Q. You were headed kind of northeast, were you, as you were going across the tracks? A. I was going east a little incline to the north.

"Q. Did you look to see if there was a car going on the south-bound track before you went on to the track? A. Yes, sir.

"Q. How far was your car away from the—your automobile away from the car tracks when you looked north to see if there was a car coming on that track? A. About eight or ten feet.

"Q. Then from the time that you looked to see whether a car was coming you went eight or ten feet to the track, and went about five feet across the track, that is, the front end of your car—you got nearly the

whole car across the track? A. You mean before the automobile went by?

"Q. Before the car struck you? A. I had got almost off the track when the car struck me."

Miss Ransom, who was a witness introduced by plaintiff, was riding in the automobile which caused plaintiff to reduce his speed while on the crossing. She testified in part:

"Q. Now, as you passed the machine, I wish you would tell the jury what, if anything, you did to the speed of your machine? A. Why, we had to speed up our machine to get out of the way of the electric.

"Q. Where was it coming at that time? A. It was coming down into Broadway.

"Q. Did you notice the electric automobile at any time as it was about to go on the track, or close to the track? A. Yes, sir.

"Q. Did you notice the approaching street car, the one that hit it? A. Yes, sir.

"Q. At that time? A. Yes, sir.

"Q. Tell the jury how far it was away? A. Well, it was about a block away when I first saw him.

"Q. When you first saw it? A. Yes, sir.

"Q. Now, did you notice, after you passed or as you were passing, did you notice the electric any further? A. Why, you mean on to the track?

"Q. Yes. A. Why, it was in about two or three feet of the track then.

"Q. And when it got down to within about two or three feet of the track did you notice the street car then? A. Yes, sir.

"Q. Where was it? A. A couple of car lengths away.

"Q. How was it running, Miss Ransom? A. At a rapid rate of speed.

"Q. Are you a judge of speed? Could you tell the jury how many miles an hour it was going? A. No, I could not.

"Q.  Did you hear any bells?  A.  No, sir.

"Q.  Before the electric was struck?  A.  No, sir.

"Q.  Tell the jury whether or not you saw the street car from then on until the collision occurred? A.  I did.

"Q.  By Mr. Morrison:  Was there or was there not any change in the speed of the car until the collision occurred?  A.  No, sir.

"Q.  Did it strike the automobile hard or easy? A.  Why, hard.

"Q.  What happened to the electric after the street car struck the electric?  A.  It was carried about fifty or sixty feet."

*On cross-examination*:

"Q.  Had it (the coupe) got to the line of Broadway then?  A.  When we were right.  Q.  When you were right opposite, the entrance?  A.  Yes, sir.

"Q.  It had gotten down to the line of Broadway at that time?  A.  Yes, sir.

"Q.  Now, how fast were you going at that time? A.  I don't know.

"Q.  Well, have you any idea?  A.  Well, we had to speed up to get out of the way.

"Q.  So that all you know is what when you were opposite Thirty-eighth street that you had to speed up, or you did speed up?  A.  Yes, sir.

"Q.  What part of Broadway was you in, on the east side of the street?  A.  Yes, sir.

"Q.  Over next to the curb?  A.  Yes, sir; oh no; it was in the middle of the street, on the east side of the street.

"Q.  Well there is quite a space between the car track, some twenty-five or thirty feet between the track and the curb, isn't there?  A.  Yes, I expect there is, I don't know.  I know we was running in the middle of the street

Flack v. Railroad.

"Q. You were about half way of the space then, whatever it was? A. Yes, sir.

"Q. And did your automobile go over towards the curb at all? A. No, sir.

"Q. Just kept right along? A. Yes, sir.

"Q. And then there was about the same space on the west side of the car tracks that there was on the east side, wasn't there? A. Why, yes, it was in the middle of the street.

"Q. How fast was this electric automobile coming? A. It wasn't coming very fast; coming about as fast as—

"Q. Was it coming as fast as you were going? A. About as fast as the electric was running.

"Q. And it continued to run that way, did it? A. Yes, as far as I could see.

"Q. Did it turn north on the west side of Broadway? A. It looks to me like it came right straight across. . . . .

"Q. Now when you were going along the street there at a rapid rate, could you tell if the car was slowed up, or not, the street car? Might it not have been slowed up and you not have been able to tell it? A. From what I saw it didn't attempt to slow up at all.

"Q. That is, you think that it didn't slow up at all, but you wouldn't say, as a matter of fact, but what it did slow up? A. I know it didn't slow up.

"Q. How do you know that? A. Well, because we turned around in the automobile and watched. We saw there was going to be a collision. . . .

"Q. You were watching the electric too, weren't you? A. Well, of course, we was watching the whole works.

"Q. Did the electric car slow up? A. Yes, the electric slowed to keep from hitting us.

162 App.—42

"Q. How near did he ever get to you, did he ever get within a hundred feet of you? A. The electric?

"Q. Yes. A. Oh, I don't know whether he did or not; he must have got closer than that, or else we would not have tried to get out of the way."

The evidence of plaintiff tends to show that the street car was running eighteen or twenty miles per hour and that the motorman made no effort to reduce speed and gave no warning signal until the instant of the collision. Some of the witnesses introduced by defendant fix the speed of the street car at about fifteen miles per hour and say that in the last two hundred feet the car ran the speed was not slackened. The conductor of the street car, one of defendant's witnesses, testified that he heard the motorman "ring his bell as though some thing was wrong and I stepped up to see what it was then" and "saw an electric machine coming down west Thirty-eighth street." According to this testimony the motorman must have realized that plaintiff might attempt to cross in front of the car. The motorman testified that he observed the approach of the coupe, saw it turn north on the west side of Broadway and supposed it would remain on that side until the street car had passed but that plaintiff suddenly wheeled eastward and ran in front of the car when it was too close for anything to be done to avert a collision. He denied there was an automobile going north on the east side of Broadway.

The cause of action pleaded in the petition and submitted to the jury is founded on negligence under the humaniterian doctrine and in the discussion of the demurrer to the evidence which defendant argues should have been given, it is not necessary for us to determine whether or not the peril of plaintiff which culminated in his injury was produced by his own negligence or by what of defendant. Our inquiry must be confined to the question of whether or not the evidence in its aspect most favorable to plain-

tiff shows that the motorman saw or should have seen his peril in time to have prevented the injury by stopping the car or reducing its speed, had he been in the exercise of ordinary care. From plaintiff's viewpoint the important facts of the situation are these: The speed of the street car was approximately four times that of the coupe and when the latter vehicle turned east from the west side of Broadway, thereby evincing the purpose of plaintiff to cross the tracks, the street car must have been from seventy-five to one hundred feet from the place of collision. The coupe which was nine feet, four inches long traveled approximately twenty feet after the peril became obvious and, therefore, Miss Ransom was quite accurate in her statement that the street car was about ninety feet from the point of collision when the coupe initiated the crossing movement.

The expert evidence of plaintiff shows that the car could have been stopped or its speed could have been greatly lessened in that distance, and yet it appears the motorman made no effort to save plaintiff though he was in a position to observe and to act. The attempt to excuse him on the plea that he had a right to assume, as did plaintiff, that the coupe would clear the crossing, will not stand analysis. Seeing that the coupe first had obtained possession of the crossing at a time when the car under his control and could be checked to give the coupe a good clearance opportunity, the motorman was negligent in relying, as he did, on a hairbreath calculation that omitted all consideration of fortuitous interruptions of the progress of the coupe. In deed, the motorman had in plain view a situation that would have informed him, had he been reasonably observant and careful, that the passing automobile would retard the progress of the coupe. The line of travel followed by the automobile brought it within nine feet of the east track, the front of the coupe was at or very near the east

rail of that track when the collision occurred, and it is apparent that plaintiff, who could not go ahead of the automobile, or turn sharply enough to the left to go between it and the street car, had to check speed to allow the automobile to go by. The fault of the motorman lay in his unwarranted assumption that plaintiff would get out of the way when all of the appearances indicated that the coupe would be struck if the street car continued at its high speed. It was the duty of the motorman, as soon as he discovered the purpose of plaintiff to cross the track, so to control his car as not to endanger the safety of plaintiff and he had no right to play a game with death with plaintiff as the stake. The suggestion that the motorman had a right to assume that plaintiff would stop just before entering the zone of danger is overborne by the fact we have mentioned that the car was from seventy-five to one hundred feet away when the contrary intention became apparent. Other witnesses, including the conductor, testified to facts which demonstrate that the motorman must have been cognizant of the purpose of plaintiff, even before the coupe turned towards the crossing. The jury were entitled to believe that the motorman had ample opportunity to avoid the injury but recklessly disregarded it and negligently ran into plaintiff.

The rules of law we have applied in reaching the conclusion that the evidence of plaintiff presents an issue of negligence on the part of the motorman in the performance of a humanitarian duty he owed plaintiff are recognized and applied in the following cases cited by counsel for plaintiff: Grout v. Electric Ry. Co., 125 Mo. App. l. c. 560; Ross v. Met. St. Ry. Co., 113 Mo. App. l. c. 607; Dahmer v. Railway, 136 Mo. App. 443; Cole v. Met. St. Ry. Co., 121 Mo. App. l. c. 611; McNamera v. Railway Co., 133 Mo. App. 645; Cole v. Railway Co. 133 Mo. App. 440; Murray v. Tran-

sit Co., 108 Mo. App. 501; Ellis v. Railway Co., 234 Mo. 657.

Nothing we have said is in conflict with the following cases relied on by defendant: Boyd v. Ry. Co., 105 Mo. 371; Watson v. Street Ry. Co., 133 Mo. 246; Holwerson v. Ry. Co., 157 Mo. 216, 225, 226; Reno v. Ry. Co., 180 Mo. 469; Schmidt v. Ry. Co., 191 Mo. 215; Boring v. Street Ry. Co., 194 Mo. 541; Sanguinette v. Ry. Co., 196 Mo. 466; Porter v. Ry. Co., 199 Mo. 82; Ellis v. Street Ry. Co., 234 Mo. 657.

We readily concede the motorman was under no duty to stop his car or reduce its speed until it appeared that plaintiff was in danger and either could not or would not extricate himself, but in this case such appearance was manifest at a time when the motorman had a reasonable opportunity to prevent the injury; and to hold that he was under no duty to try to save plaintiff would be to repudiate *in toto* the humanitarian doctrine which now is so firmly imbedded in our jurisprudence that we could not dislodge it if we would.

The demurrer to the evidence was properly overruled. We find no prejudicial error in the rulings of the court on evidence or in the instructions to the jury. The remittitur cured the verdict of all excessiveness. the cause was fairly tried, and the judgment is affirmed.

*Broaddus, P. J.,* concurs; *Ellison, J.,* dissents.

## DISSENTING OPINION.

ELLISON, J.—I find myself prevented from concurring is the foregoing opinion on account of the testimony of the plaintiff himself. The conceded facts are that when his vehicle was struck by the car, it had gotten almost clear of danger. The collision was with the rear part. A bare moment more and

this unfortuate affair would not have occurred. Plaintiff had seen the car coming before he turned across the track. He, of course, thought he could cross before it reached him; and if we assume that the motorman saw him, he too, could assume that there was time for the crossing. And there *was* time; but for a sudden change of plaintiff's movement, which certainly the motorman could not have foreseen. Plaintiff testified that after starting across the track, he slowed down the speed to a mere drag. So it is clear that by reason of this act, for which no responsibility could attach to the motorman, the collision occurred. I think, as said by the Supreme Court (Boyd v. Ry Co., 105 Mo. 371) that unless motormen ''are required to be such expert psychologists as to be able to read the minds of men, and know beforehand when a man is possession of all his mental faculties, is going to act in a way other then could be expected of an ordinarily prudent man, there was no evidence to take this case to the jury.''